# STATE OF CONNECTICUT *v.* RICARDO CORREA
## (SC 20246)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The defendant was convicted, following a conditional plea of nolo conten-
dere, of the crimes of conspiracy to possess a controlled substance with
intent to sell, conspiracy to possess narcotics with intent to sell by a
person who is not drug-dependent, and conspiracy to operate a drug
factory. During surveillance of a motel for illegal activity, a police officer,
observing an individual, T, quickly enter and exit the defendant's motel
room at around 1 a.m., believed that he had witnessed a drug transaction.
After T exited the motel room, he entered a vehicle driven by another
individual, which departed from the motel. A short distance from the
motel, the police stopped the vehicle. When the police approached the
vehicle, they smelled a strong odor of marijuana emanating from inside

---

* The listing of justices reflects their seniority status on this court as of
the date of oral argument.

State *v.* Correa

the vehicle. After T was removed from the vehicle, he admitted to possessing marijuana. A search of T's person revealed, inter alia, marijuana and heroin. The police ultimately detained T, who, at that time, denied being in or having any connection with the defendant's motel room. The police then went to the house of T's grandmother, where T was living. After T's grandmother consented to a search of T's bedroom, the officers searched that room and found numerous plastic bags with the corners cut off, as well as other bags containing an off-white powder residue. The officers went back to the motel and spoke with the manager, who advised them that the defendant paid cash to rent a room there for a week and provided them with a copy of the defendant's driver's license. The manager also indicated that a guest registration card for that room included the name of an individual with T's surname, which the police believed was most likely T. The officers then went to knock on the defendant's motel room door. The officers observed a light on, but no one answered. One of the officers then retrieved a canine officer and conducted a canine sniff of the motel walkway in the vicinity of the defendant's room. The canine alerted that it had detected contraband at the bottom of the door to the defendant's room. On the basis of all that had transpired since observing T enter and exit the defendant's room, the police decided to apply for a warrant to search the defendant's room. Before the police submitted their application for a warrant, however, one of the officers noticed the defendant walking away from the motel. The defendant was ultimately detained, and the officers found a large wad of cash on his person, as well as a motel room key. The police informed the defendant that T had admitted to them that he was storing his supply of marijuana in the defendant's motel room, and the defendant responded that nothing in the room was his. The defendant agreed to open the door to the room for the officers but then changed his mind and refused to grant them entry. The defendant also indicated at that time that no one was in the room. To ensure that there was no one in the room who might destroy evidence before the officers could obtain a warrant, one of the officers used the defendant's key to open the door. After opening the door, and without entering, an officer looked inside for approximately fifteen to thirty seconds and then closed the door. While the door was open, the officer observed evidence of drug activity. The defendant was then informed he could leave. Thereafter, the police prepared an application for and obtained a search warrant for the room. The application had been based on the results of the canine sniff of the door of the motel room, the observations made during the visual sweep of the room, and T's admission to the police that he had kept his supply of marijuana in the room. A search of the room revealed a large quantity of heroin, among other items related to drug activity. The defendant filed a motion to suppress the evidence that had been seized from the motel room, claiming, inter alia, that the search violated his rights under the Connecticut constitution (art. I, § 7) because

State *v.* Correa

the search warrant application contained information obtained from an allegedly unlawful, warrantless visual sweep of the motel room. The trial court denied the motion, concluding that the visual sweep was necessary to prevent the imminent destruction of evidence and, therefore, was justified by the exigent circumstances exception to the warrant requirement. The court also determined that, even if the visual sweep was not justified under that exception, the evidence seized during the execution of the search warrant was admissible under the independent source doctrine. The defendant appealed to the Appellate Court from the judgment of conviction, claiming, as he had in the trial court, that he was entitled to suppression of the evidence found in the motel room because the search warrant derived from the allegedly unlawful visual sweep of the room. The defendant also asserted, for the first time, that he was entitled to suppression of the evidence because the search warrant application included information obtained from the warrantless canine sniff conducted by the police outside of the door of his motel room. The Appellate Court affirmed the trial court's judgment, concluding that the visual sweep was constitutionally permissible under the exigent circumstances exception and that a warrant was unnecessary with respect to the canine sniff because the sniff was not a search under the state constitution. On the granting of certification, the defendant appealed to this court. *Held*:

1. The canine sniff of the exterior door to the defendant's motel room was a search for purposes of article first, § 7, of the Connecticut constitution: the protection against a canine sniff that is afforded to a resident of a multiunit condominium complex under the state constitution in accordance with *State* v. *Kono* (324 Conn. 80) also extends to the occupant of a motel room, as motel guests have a reasonable expectation of privacy in their rooms, the fact that motel guests typically do not keep all of their personal effects in their rooms did not mean that the personal effects that guests do keep there should be subject to less protection under the law, a room occupied by a motel guest is not more vulnerable to a warrantless canine sniff than an apartment, condominium or house simply because other guests occupy nearby rooms or because rooms may be entered by motel staff to perform certain functions, and motel guests reasonably do not expect that the foot traffic generally associated with an open-air walkway abutting the motel's guestrooms includes law enforcement officers trolling the walkway with a trained canine in search of contraband.

2. The state could not prevail on its claim that, even if the canine sniff of the door to the defendant's motel room was a search, such a search could be conducted without a warrant, as long as the search was based on reasonable and articulable suspicion that there were illicit drugs in the room: although cases from other jurisdictions hold that a canine sniff of the door to an apartment or a condominium unit in a multiunit building is lawful if it is based on reasonable and articulable suspicion

State *v.* Correa

rather than on probable cause, this court determined that those cases were incompatible with its reasoning and holding in *Kono*; moreover, under article first, § 7, searches conducted without a warrant based on probable cause are presumed to be unreasonable, the state's heavy burden of overcoming that presumption is met only in certain exceptional or compelling circumstances, and the few recognized exemptions from the warrant requirement under the state constitution invariably have involved searches conducted under circumstances requiring immediate action by the police, generally, in the interest of police or public safety, a consideration that was not implicated by a canine sniff performed to ascertain whether a motel room contains unlawful drugs; accordingly, a canine sniff of the exterior door to a motel room satisfies state constitutional requirements only if it follows the issuance of a warrant founded on probable cause.

3. The information available to the police unrelated to the canine sniff was sufficient to establish probable cause for the search of the defendant's motel room, but a remand to the trial court was necessary to afford the state an opportunity to demonstrate that the evidence seized from that room was admissible under the independent source doctrine by establishing that the police would have sought the warrant regardless of the results of the canine sniff: the facts, untainted by the results of the canine sniff, were sufficient, standing alone, to support the issuance of the warrant, as T previously had been staying in the motel room, T was involved with and likely selling drugs, T was likely engaged in a drug transaction when he entered and immediately exited the room in the middle of the night, and there were likely drugs or drug related items in the room in light of what the police found on the defendant's person and the defendant's denial that anything in the motel room belonged to him; nevertheless, because the defendant did not raise the issue of the constitutionality of the canine sniff in the trial court and, thus, the state had no reason to adduce evidence demonstrating that the police were prepared to seek a warrant prior to the canine sniff or that they otherwise would have done so if the canine sniff had not occurred, the record was not clear with respect to that issue, and it would have been unfair to the state if this court had resolved the state's independent source claim on the basis of an undeveloped record; moreover, the inadequacy of the record with respect to the state's independent source claim did not require this court to reject the defendant's constitutional challenge to the canine sniff under the first prong of *State* v. *Golding* (213 Conn. 233), which ordinarily would bar appellate review of the defendant's unpreserved constitutional challenge on the basis that remands to supplement the record are generally not permitted, as a remand to allow the state to present additional evidence was appropriate, under the unusual circumstances of this case, insofar as allowing the Appellate Court's decision to stand would be contrary to the unanimous determination of this court that the canine sniff was unlawful, and vacating the Appellate Court's judgment would result in confusion with respect to the legality of a warrantless canine sniff of a motel room.

340 Conn. 619          JANUARY, 2022                    623

State *v.* Correa

4. This court could not resolve, as a matter of law, the state's claim that the evidence seized from the motel room was admissible under the inevitable discovery doctrine on the ground that such evidence would have been discovered by lawful means in the absence of the canine search: although it was apparent that the investigating officers were seeking to develop enough evidence to obtain a warrant for the motel room even before the canine sniff was conducted and that their investigation could have resulted in their obtaining a warrant even if the canine sniff never occurred, the evidence adduced at the defendant's suppression hearing did not establish, as a matter of law, that the police would have sought a warrant irrespective of the canine sniff; moreover, because this court lacked the authority to find facts, it could not resolve the factual issue presented by the state's inevitable discovery claim, as the undisputed evidence did not lead to only one possible conclusion; nevertheless, as the state had no reason to adduce evidence in support of its inevitable discovery claim before the trial court insofar as the defendant did not challenge the propriety of the canine sniff in that court, this court concluded that, on remand, the state must be afforded the opportunity to present additional evidence in support of that claim.

5. The Appellate Court and the trial court incorrectly determined that the visual sweep of the defendant's motel room was justified by exigent circumstances, as the possibility that evidence would be destroyed was too speculative: the belief held by the police that an immediate visual sweep of the room was necessary to avert the destruction of evidence was not objectively reasonable, as the police knew that neither of the two individuals actually linked to the motel room was in a position to destroy evidence located inside the room because, at the time of the visual sweep, T was under arrest and the defendant was with the police, there was nothing in the record to suggest that the police had reason to believe that anyone else had a similarly direct connection to the room or its contents, the generalized possibility that an unknown person might be lurking inside was not sufficient to justify a visual sweep, and, except for the unremarkable fact that a light was on inside the room, the record was devoid of any evidence from which a police officer reasonably could have concluded that someone was inside the room; moreover, the determination of whether the state could prevail on its claim that any impropriety stemming from the visual sweep was obviated by the independent source doctrine required additional fact-finding, and, accordingly, this court directed that, on remand, the state must be afforded the opportunity to present additional evidence related to whether the police would have sought a warrant irrespective of the visual sweep, and the trial court's determination of that issue must be made in light of the fact that the canine sniff was also unlawful.

Argued February 27, 2020—officially released September 15, 2021**

** September 15, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Correa

*Procedural History*

Information charging the defendant with the crimes of possession of four or more ounces of marijuana, conspiracy to possess four or more ounces of marijuana, possession of a controlled substance with intent to sell, conspiracy to possess a controlled substance with intent to sell, possession of narcotics, conspiracy to possess narcotics, possession of narcotics with intent to sell by a person who is not drug-dependent, conspiracy to possess narcotics with intent to sell by a person who is not drug-dependent, operation of a drug factory, and conspiracy to operate a drug factory, brought to the Superior Court in the judicial district of Stamford, geographical area number one, where the court, *Blawie, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the defendant was presented to the court on a conditional plea of nolo contendere to the crimes of conspiracy to possess a controlled substance with intent to sell, conspiracy to possess narcotics with intent to sell by a person who is not drug-dependent, and conspiracy to operate a drug factory; judgment of guilty in accordance with the plea; subsequently, the state entered a nolle prosequi as to the remaining charges, and the defendant appealed to the Appellate Court, *Alvord*, *Prescott* and *Beach*, *Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Reversed*; *further proceedings*.

*Laila M. G. Haswell*, senior assistant public defender, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, chief state's attorney, and *Susan M. Campbell*, assistant state's attorney, for the appellee (state).

State *v.* Correa

*Opinion*

PALMER, J. The primary issue presented by this appeal is whether article first, § 7, of the Connecticut constitution[1] prohibits the police from conducting a warrantless canine sniff of the exterior door to a motel room for the purpose of detecting the presence of illegal drugs inside the room. We conclude that a warrantless canine sniff of the exterior door to a motel room by the police violates article first, § 7, because its use for that purpose constitutes a search subject to the warrant requirement of that state constitutional provision.

The defendant, Ricardo Correa, was charged with several drug related offenses and, thereafter, filed a motion to suppress the evidence, including heroin and marijuana, that had been seized from his motel room pursuant to a search warrant. In support of the motion, he claimed that the search violated his rights under article first, § 7, of the Connecticut constitution and the fourth amendment to the United States constitution because the search warrant affidavit contained information obtained from an allegedly unlawful, warrantless visual sweep of his motel room. The trial court denied the motion on the ground that the visual sweep was necessary to prevent the imminent destruction of evidence and, therefore, was justified by the exigent circumstances exception to the warrant requirement. The trial court further concluded that, even if the visual sweep was not justified under that exception, the evidence seized during the execution of the search warrant was admissible under the independent source doctrine. The defendant subsequently entered a conditional plea

[1] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

State *v.* Correa

of nolo contendere; see General Statutes § 54-94a;[2] to the charges of conspiracy to possess a controlled substance with intent to sell in violation of General Statutes §§ 21a-277 (b) and 53a-48, conspiracy to possess a controlled substance with intent to sell by a person who is not drug-dependent in violation of General Statutes §§ 21a-278 (a) and 53a-48, and conspiracy to operate a drug factory in violation of General Statutes §§ 21a-277 (c) and 53a-48, reserving his right to appeal from the denial of his motion to suppress. The trial court imposed a total effective sentence of nine years' imprisonment.

The defendant appealed to the Appellate Court, claiming, contrary to the determination of the trial court, that he was entitled to suppression of the evidence found in the motel room because the search warrant pursuant to which that evidence was seized was derived from the unlawful visual sweep of the room. See *State* v. *Correa*, 185 Conn. App. 308, 311, 197 A.3d 393 (2018). In addition, he claimed for the first time that the evidence must be suppressed because the search warrant affidavit also included information obtained from a canine sniff conducted by the police outside the door of his motel room, which, the defendant maintained, violated his rights under article first, § 7, because it was performed without a warrant predicated on probable cause. Id., 321. The Appellate Court rejected both of these claims, concluding, with respect to the visual

_____

[2] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

State *v.* Correa

sweep, that it was constitutionally permissible under the exigent circumstances exception to avert the destruction of evidence; see id., 340; and, with respect to the canine sniff, that a warrant was unnecessary because the sniff was not a search for purposes of the state constitution. See id., 330–31. The Appellate Court therefore affirmed the judgment of the trial court; id., 340; and we granted the defendant's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court [correctly] determine that a police canine sniff that took place outside of the defendant's motel room was not a search that violated the defendant's rights under article first, § 7, of the Connecticut constitution?" And (2) "[d]id the Appellate Court [correctly] conclude that the visual sweep of the defendant's motel room was justified by exigent circumstances?" *State* v. *Correa*, 330 Conn. 959, 959–60, 199 A.3d 19 (2019). We agree with the defendant that the Appellate Court incorrectly determined that the canine sniff was lawful under article first, § 7. We also agree with the defendant that the visual sweep was not justified by the exigencies of the situation. For the reasons set forth more fully hereinafter, however, we further conclude that the case must be remanded to the trial court so that the state may have the opportunity to adduce testimony establishing, first, that the evidence seized pursuant to the search warrant was admissible, notwithstanding the impropriety of the canine sniff, under the independent source or inevitable discovery doctrine, and, second, that the evidence seized pursuant to the warrant was admissible, notwithstanding the impropriety of the visual sweep, under the independent source doctrine.

I

FACTS AND PROCEDURAL HISTORY

The opinion of the Appellate Court sets forth the following facts, as found by the trial court on the basis of

State *v.* Correa

the evidence adduced at the hearing on the defendant's motion to suppress, and procedural history. "During the early morning hours of February 5, 2013, Sergeant Christopher Broems of the Stamford Police Department was parked on Home Court, a street immediately behind the America's Best Value Inn motel (motel) on East Main Street in [the city of] Stamford. Sergeant Broems, a nineteen year veteran of the Stamford Police Department who also spent three years in the New York City Police Department, had made many prior arrests at the motel for narcotics, prostitution, and other criminal activity. From the street, Sergeant Broems was surveilling the motel for evidence of possible illegal activity. He was parked approximately fifty yards away from the motel and had a clear, well illuminated view of the motel, which included two floors of numbered motel room doors that opened onto the back parking lot.

"At approximately 1:20 a.m., Sergeant Broems observed a silver colored 2004 GMC Yukon pull into the motel parking lot. Only the passenger in the Yukon, who was later determined to be Eudy Taveras, exited the Yukon, while the operator remained in the vehicle with the headlights on. Taveras approached and entered room 118 of the motel, which was on the first floor, where he remained for less than one minute. Taveras returned to the vehicle, which then left the motel. Given the location, time of night, and duration of the visit, Sergeant Broems believed that he may have witnessed a narcotics transaction out of room 118. Sergeant Broems radioed to a nearby colleague, Officer Vincent Sheperis, [indicating] that he intended to stop the Yukon, and then drove in the direction of the Yukon.

"When the operator of the Yukon, who was later determined to be Charles Brickman, observed Sergeant Broems approaching the Yukon in his marked Stamford Police SUV, he turned off [his] headlights. A short distance from the motel, Sergeant Broems stopped the

State *v.* Correa

vehicle. Officer Sheperis joined Sergeant Broems, acting as backup. When Sergeant Broems and Officer Sheperis approached the vehicle, they both smelled a strong odor of marijuana emanating from inside the Yukon. Sergeant Broems and Officer Sheperis removed Taveras from the vehicle, and Taveras admitted to possessing 'weed.' A search of Taveras revealed two glass jars with yellow tops containing marijuana, along with three other similar, but empty, yellow topped glass jars, as well as a knotted corner of a plastic sandwich bag containing heroin. On the basis of this evidence, Sergeant Broems requested a sweep of the Yukon by a canine officer trained in the detection of narcotics.

"A canine officer, Cooper, and his Stamford Police Department handler, Sergeant Seth O'Brien, arrived on the scene shortly after Sergeant Broems' request. Cooper alerted to the center console of the vehicle, but the officers found no additional drugs. Brickman was found to have no drugs on his person." *State* v. *Correa*, supra, 185 Conn. App. 311–13. In response to questioning by the police, Brickman stated that Taveras was "staying in the hotel" but that he "[did not] know what [Taveras] was getting" when he entered and then quickly exited the first floor room there. Brickman was issued a ticket for operating a motor vehicle without headlights but was allowed to leave in the Yukon. The officers detained Taveras, who, at that time, denied being in or having any connection to the motel room. Taveras also denied having any more marijuana.

"Taveras informed Sergeant O'Brien that he lived with his grandmother nearby on Charles Street in Stamford. At that point, Sergeant Broems, Officer Sheperis, and Sergeant O'Brien went to the grandmother's home on Charles Street, where they spoke with Taveras' brother. [According to his brother, Taveras was in the process of moving out of the house.] Taveras' grandmother signed a consent form allowing the officers

State *v.* Correa

to search Taveras' bedroom. In Taveras' bedroom, the officers found numerous plastic bags with the corners cut off, consistent with narcotics packaging, along with other bags containing an [off-white] powder residue.

"The officers then returned to the motel. They spoke with the manager of the motel, who advised them that, several days earlier, the defendant rented room 118 for the week, until February 8, 2013, paying $430 in cash.[3] The manager provided the officers with documentation concerning room 118, including a photocopy of the defendant's driver's license. The guest registration card for room 118 also included the name of a second individual, Victor Taveras. Although the officers were not certain who Victor Taveras was, Sergeant O'Brien testified that . . . he most likely was Eudy Taveras.

"After speaking with the manager, the officers went together to knock on the door of room 118. The officers observed a light on in the room, but no one answered the door. Sergeant O'Brien then retrieved Cooper and conducted a narcotics sweep, which included several passes [of four rooms located] along the first floor walkway [including] room 118 . . . . On each pass, Cooper consistently alerted to the presence of narcotics at the door to room 118.[4]

"It was then approximately 3 a.m. on February 5, 2013, a little over ninety minutes since Sergeant Broems first observed Taveras enter and exit room 118. At this point, on the basis of all that had transpired since observing Taveras enter and exit room 118, [and after conferring by telephone with the shift commander, Lieutenant Philip Mazzucco, and another sergeant, Adrian Novia,[5]

---

[3] "As the result of a prior case, the Stamford police already knew the defendant by name." *State* v. *Correa*, supra, 185 Conn. App. 313 n.2.

[4] Cooper alerted only to the defendant's motel room.

[5] According to testimony adduced by the state at the suppression hearing, Sergeant Novia previously had been assigned to the narcotics division of the Stamford Police Department.

State *v.* Correa

both of whom were at Stamford police headquarters],
Sergeant Broems decided to apply for a warrant to
search room 118. The officers decided that Sergeant
Broems and Officer Sheperis would return to . . .
headquarters to prepare the search warrant and to pro-
cess Taveras for his drug charges, and Sergeant O'Brien
would remain behind on Home Court, in the same area
where Sergeant Broems was parked earlier, to surveil
room 118 for any possible activity. Very shortly after
the officers split up, however, just as Sergeant O'Brien
was getting into position to surveil room 118, he
observed the defendant on foot near the motel at the
corner of Home Court and East Main Street, walking
away from the motel. Sergeant O'Brien, who recognized
the defendant, immediately radioed for Sergeant
Broems and Officer Sheperis to return to the motel to
stop the defendant.

"While walking on Home Court, the defendant made
eye contact with Sergeant O'Brien, who was in a marked
police SUV. After the defendant made eye contact with
Sergeant O'Brien, the defendant changed his direction
and began walking east on East Main Street. About 100
yards from the motel, Sergeant O'Brien approached the
defendant, stepped out of his police vehicle, and,
addressing the defendant as 'Ricky,' told the defendant
that he needed to speak with him. Initially, the defen-
dant was cooperative. Sergeant Broems arrived on the
scene, and the defendant was searched. The officers
found that the defendant was carrying a large wad of
cash, amounting to over $3600, in his pocket, along with
a key to a room at the motel. Sergeant O'Brien [seized
the cash that the defendant had in his possession and
informed him that Taveras, who at police headquarters
later admitted to storing his supply of marijuana in the
room, had been] taken into custody, and that 'the jig
is up.' The defendant responded, 'nothing in the room

State *v.* Correa

is mine.''[6] The defendant agreed to open the door to
room 118 for the officers. When the officers and the
defendant reached the threshold of room 118, however,
the defendant changed his mind and refused to grant
them entry. The officers informed the defendant that,
if he did not consent to a search of the room, they were
going to obtain a search warrant.

"The defendant informed Sergeant Broems that there
was no one in the room. To ensure that there was no
one else inside the room [who] might destroy evidence
before the officers could obtain a search warrant, how-
ever, Sergeant Broems used the defendant's room key
to open the door. After opening the door, Sergeant
Broems announced, '[p]olice,' and looked inside the
room for approximately fifteen to thirty seconds.[7] Once
he was satisfied that the room contained no occupants,
Sergeant Broems closed the door. While the door was
open, neither Sergeant Broems, nor any other officer
or Cooper, set foot in or otherwise physically entered
room 118. When he did not observe anyone in the room,
Sergeant Broems 'cleared' room 118. Although he did
not enter the room, or take any steps to seize any evi-
dence located inside the room, Sergeant Broems did
observe a large black digital scale on a table, as well
as a plastic sandwich bag lying on the floor nearby. The
officers advised the defendant that he was free to leave
the motel, and the defendant left.

"Following the defendant's departure, other officers
of the Stamford Police Department arrived at the motel.

[6] When, however, Sergeant O'Brien asked the defendant about the $3600
in cash that he was carrying, the defendant stated that he had "papers" to
prove that he had "earned" the money. Queried further by Sergeant O'Brien
about those papers, the defendant indicated that they were in the motel
room, the location that, the defendant stated, was "where [he] live[d]."

[7] "Sergeant O'Brien characterized the sequence of events as follows: '[Ser-
geant Broems] cracked the door, stuck his head in, cleared it, you know,
visually, and then he relayed that nobody else was in there, [and] he closed
the door." *State* v. *Correa*, supra, 185 Conn. App. 315 n.3.

State *v.* Correa

Those officers were assigned to watch room 118 while the investigating officers prepared an application for a search warrant, with Sergeant O'Brien and Officer Sheperis acting as affiants. [The facts contained in their affidavit in support of the warrant application included the canine sniff indicating that there were illegal drugs in the room, the visual sweep of the room by the police and their observation during that sweep of the digital scale and plastic bag, and the acknowledgment by Taveras, following his arrest and booking at police headquarters, that he kept his supply of marijuana in the room.] Several hours later, at 9:20 a.m., the court, *Hon. Richard F. Comerford, Jr.*, judge trial referee, signed the search warrant for room 118.

"When the police executed the search warrant, they discovered a total of approximately 200 grams of heroin, with a street value of approximately $85,000. The heroin was broken down into dozens of smaller baggies or glassine folds for individual sale. The officers also discovered a large quantity of [United States] currency, a laptop computer, and paper documents pertaining to a street gang, the Latin Kings. The police also discovered [more than] four ounces of marijuana and a quantity of packaging materials, along with a vacuum sealing machine, two sifters, and two digital scales. These items were consistent with the operation of a drug factory by the defendant in the motel room. After the search warrant was executed, the police arrested the defendant at Taveras' grandmother's house on Charles Street. The defendant was charged with a variety of felony drug offenses. On October 28, 2015, the defendant filed a motion to suppress 'all items seized by [the] police on February 5, 2013, from America's Best Value Inn [r]oom . . . 118.' In his memorandum of law in support of the motion to suppress, the defendant argued that, because Sergeant Broems' visual sweep of the room was performed without obtaining a valid search warrant, it

State *v.* Correa

was 'per se unreasonable.' The defendant further argued that, because the search did not fall within any recognized exceptions to the warrant requirement, as no exigent circumstances existed at the time and the conduct fell short of a protective sweep, 'any evidence found as a result of the prior police illegality must be suppressed.'

"The [trial] court held a hearing on the motion to suppress on February 29, 2016. The state presented the testimony of Sergeant Broems, Officer Sheperis, and Sergeant O'Brien. At the conclusion of the suppression hearing, the state did not contest that Sergeant Broems' visual sweep of the room constituted a warrantless search within the meaning of the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution. Rather, the state argued that, because [Sergeant] Broems' visual sweep of room 118 was undertaken 'solely for the purpose of [e]nsuring . . . that no evidence was being destroyed,' it was lawful pursuant to the exigent circumstances exception to the warrant requirement. The state specifically noted that the visual sweep did not constitute a 'protective sweep.'[8] The state alternatively argued that, even if the visual sweep was unlawful, the evidence seized from the room was still admissible pursuant to the independent source doctrine.

"On June 22, 2016, the court denied the defendant's motion to suppress in a written memorandum of decision. The court concluded that Sergeant Broems' warrantless visual sweep was proper, under the exigent

---

[8] We note that, under the protective sweep exception to the warrant requirement, which "is rooted in the investigative and crime control function of the police"; *State* v. *Kendrick*, 314 Conn. 212, 229, 100 A.3d 821 (2014); "a law enforcement officer present in a home under lawful process . . . may conduct a protective sweep when the officer possesses articulable facts [that], taken together with the rational inferences from those facts, would warrant a reasonably prudent officer [to believe] that the area to be swept harbors an individual posing a danger to those on the . . . scene." (Emphasis omitted; internal quotation marks omitted.) Id., 230.

State *v.* Correa

circumstances doctrine, to prevent the destruction of evidence. The court reasoned that, 'when all the facts of this case as known by [the] police at the time of the warrantless entry by [Sergeant] Broems are viewed objectively, the case meets the criteria for a finding of exigent circumstances.' '' (Footnotes altered.) *State* v. *Correa*, supra, 185 Conn. App. 313–18. The court also agreed with the state that, even if the visual sweep was not justified by the exigencies of the situation, the evidence discovered as a result of that sweep was admissible under the independent source doctrine. Id., 319.

''On October 19, 2016, the defendant entered a conditional plea of nolo contendere to [the charges of] conspiracy to possess a controlled substance with intent to sell . . . conspiracy to possess a controlled substance with intent to sell by a person who is not drug-dependent . . . and conspiracy to operate a drug factory . . . . The plea was entered conditionally on [the defendant's] right to take an appeal from the [trial] court's ruling on the motion to suppress. The [trial] court . . . rendered . . . judgment of conviction . . . [and] sentenced the defendant to a term of incarceration of nine years on each of the charges, followed by six years of special parole, to run concurrently with one another, for a total effective sentence of nine years to serve followed by six years of special parole. On March 31, 2017, the court made a finding that the motion to suppress was dispositive of the case.'' Id., 319–20.

The defendant then appealed to the Appellate Court, claiming that the trial court had incorrectly determined that the visual sweep of the motel room was lawful under the exigent circumstances doctrine or, alternatively, under the independent source doctrine. See id., 332. In addition, he claimed for the first time on appeal that the canine sniff of the door to the motel room constituted an unlawful search under article first, § 7,

State *v.* Correa

of the state constitution.[9] Id., 321. With respect to his latter contention, the defendant maintained that he was entitled to prevail on his unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015),[10] because the record was adequate for review and the resolution of the defendant's claim was governed by this court's then recent decision in *State* v. *Kono*, 324 Conn. 80, 122, 152 A.3d 1 (2016),[11] which held that article first, § 7, prohibits the police from conducting a warrantless canine sniff of the front door of a condominium in a multiunit condominium complex, and the common hallway adjacent thereto, for the purpose of detecting marijuana. See *State* v. *Correa*, supra, 185 Conn. App. 321, 324.

The state opposed the defendant's first claim on the ground that the visual sweep of the motel room was justified by exigent circumstances; id., 332; but that, even if the sweep was not so justified, the seized evidence was admissible under the independent source doctrine. Id., 317–18. The state disagreed with the defendant's claim concerning the canine sniff for several reasons. First, the state argued that the record was inadequate for review of the claim under the first prong of *Golding* because, in light of the defendant's failure to challenge the constitutional propriety of the canine sniff in the trial court, the state had no occasion to

---

[9] The defendant did not raise a federal constitutional challenge to the canine sniff.

[10] Under *Golding*, a defendant who raises a constitutional claim for the first time on appeal may prevail on that unpreserved claim only if (1) the record is adequate for review, (2) the claim is of constitutional magnitude, (3) the alleged constitutional violation deprived the defendant of a fair trial, and (4) subject to harmless error analysis, the state cannot demonstrate the harmlessness of the constitutional violation beyond a reasonable doubt. *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781.

[11] We note that our decision in *Kono* was not issued until after the conclusion of the trial court proceedings in the present case.

State *v.* Correa

prove what it maintained was an alternative rationale for the admissibility of the seized evidence, namely, the independent source doctrine.[12] See id., 322 n.9. The state also contended that, in the event the Appellate Court elected to consider the merits of the claim, the defendant could not establish a constitutional violation because the canine sniff was not a search subject to the requirements of article first, § 7. See id. In addition, the state maintained that, even if the canine sniff was a search, it need only have been supported by a reasonable and articulable suspicion, a standard that, the state further asserted, was satisfied in the present case. Id., 331 n.21. Finally, the state argued that, if the Appellate Court agreed with the defendant that the canine sniff constituted a full-blown search requiring a warrant predicated on probable cause, the seizure of the evidence from the motel room was lawful nonetheless under the independent source or inevitable discovery doctrine. See id., 322 n.9, 331 n.20.[13]

The Appellate Court rejected the defendant's claim regarding the visual sweep of the motel room, agreeing with the trial court that it was permissible due to exigent circumstances.[14] Id., 340. The Appellate Court also considered and rejected the defendant's contention con-

---

[12] The state has made no claim on appeal, however, that the alleged inadequacy of the record stems from the performance of the canine sniff *itself*. Rather, the state's contention concerning the inadequacy of the record is predicated solely on its inability to present evidence in the trial court to support its claim of an independent source. See *State* v. *Correa*, supra, 185 Conn. App. 322 n.9.

[13] We note that the opinion of the Appellate Court contains no reference to the state's claim under the inevitable discovery doctrine, the applicability of which, the state further asserted, was definitively established by the testimony presented at the suppression hearing.

[14] Accordingly, the Appellate Court did not reach the state's alternative claim that, as the trial court found, the evidence obtained from the motel room was admissible under the independent source doctrine, even if the visual sweep was not justified by exigent circumstances. See *State* v. *Correa*, supra, 185 Conn. App. 340 n.23.

State *v.* Correa

cerning the constitutionality of the canine sniff, concluding that the sniff was not a search subject to the protection of the state constitution. See id., 330. In light of this determination, it was unnecessary for the Appellate Court to address the state's arguments that the claim was unreviewable and, even if reviewable, that the evidence seized was admissible under the independent source or inevitable discovery doctrine. See id., 331 n.20.

In rejecting the defendant's argument under *Kono*, the Appellate Court explained that the present case is distinguishable from *Kono* because, in that case, the hallway in which the canine sniff occurred "was closed off and located on the *inside of* the condominium complex structure, which was restricted by a locked door. It was accessible only by keycard access, and the police needed to obtain permission before entering the hallway." (Emphasis in original.) Id., 329–30. In contrast, in the present case, "[t]he open, shared walkway . . . was located on the outside of the structure. It was open to the public, as well as completely illuminated and visible to anyone as far as fifty yards away, even at nighttime. Furthermore, no permission was required to traverse the walkway, evidenced by the ease with which the officers, and eventually Cooper, did so." Id., 330. This distinction, the Appellate Court concluded, was fatal to the defendant's claim of a constitutional violation, primarily because he was unable to establish "a reasonable expectation of privacy [in] the outside of the door to his motel room." Id.

On appeal to this court, the defendant contends that the Appellate Court incorrectly determined that the canine sniff of the door to the motel room was not a search in violation of article first, § 7. The defendant further contends that the Appellate Court incorrectly concluded that the visual sweep of the motel room was lawful under the exigent circumstances doctrine

State *v.* Correa

to prevent the destruction of evidence. In response, the state renews the arguments that it made in the Appellate Court to support its contention that the judgment of that court should be affirmed.

We conclude, first, that the canine sniff of the motel room was unlawful under article first, § 7, because it was a search requiring a warrant supported by probable cause. We also conclude, however, that the case must be remanded to the trial court so that the state may present additional testimony in connection with its claim that the evidence seized pursuant to the search warrant was admissible under the independent source or inevitable discovery doctrine despite the impropriety of the canine sniff. With respect to the visual search, we conclude that it was not justified by exigent circumstances. We further conclude, however, that the trial court, after affording the state the opportunity to supplement the record, shall reconsider the state's claim that the illegality of the visual search was obviated by the independent source doctrine.

II

THE CANINE SNIFF: WAS IT A SEARCH?

We begin with the defendant's unpreserved claim that the canine sniff of the door to his hotel room was a search for purposes of article first, § 7, of the Connecticut constitution.[15] "It is well established that this court, in determining whether the police conducted a search under article first, § 7, employ[s] the same analytical framework that would be used under the federal consti-

_____

[15] Ordinarily, under *Golding*, we address the adequacy of the record before considering the merits of the unpreserved constitutional claim. See, e.g., *State* v. *Brunetti*, 279 Conn. 39, 54, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). For purposes of the defendant's constitutional challenge to the canine sniff, however, we address the merits of the claim first and the adequacy of the record hereafter, in parts IV and V of this opinion.

State *v.* Correa

tution. . . . Specifically, we ask whether the defendant has established that he had a reasonable expectation of privacy in the area or thing searched.[16] . . . In the absence of such an expectation, the subsequent police action has no constitutional ramifications. . . . The determination of whether such an expectation exists is to be made on a [case-by-case] basis . . . and requires a [two part] inquiry: first, whether the individual has exhibited an actual subjective expectation of privacy, and, second, whether that expectation is one society recognizes as reasonable. . . . Whether a defendant's actual expectation of privacy in a particular place is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances." (Citation omitted; footnote altered; internal quotation marks omitted.) *State* v. *Kono*, supra, 324 Conn. 89–90. Thus, "[t]his determination is made on a case-by-case basis. . . . The burden of proving the existence of a reasonable expectation of privacy rests [with] the defendant." (Internal quotation marks omitted.) *State* v. *Jacques*, 332 Conn. 271, 279, 210 A.3d 533 (2019).

---

[16] It bears emphasis, however, that "[o]ur adoption of an analytical framework or methodology used under the federal constitution does not compel this court to reach the same outcome that a federal court might reach when the methodology is applied to a particular set of factual circumstances. Even when the state and [f]ederal [c]onstitutions contain the same [or similar] language and employ the same methodology to govern the interpretation and application of that language [as they do in the present case], the ultimate constitutional decision often will turn [on] a factual assessment of how society feels about certain matters or how society functions under various conditions. . . . In each instance it could matter greatly which society you are talking about: a privacy claim lacking the national consensus necessary to trigger federal constitutional protection might still enjoy local support strong enough to dictate state constitutional protection . . . ." (Internal quotation marks omitted.) *State* v. *Kono*, supra, 324 Conn. 89 n.6; see also *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 406, 119 A.3d 462 (2015) ("It is beyond dispute that we are not bound by federal precedents in interpreting our own state constitutional provisions. [F]ederal decisional law is not a lid on the protections guaranteed under our state constitution." (Internal quotation marks omitted.)).

State *v.* Correa

"The determination that a particular place is protected under [article first, § 7] requires that it be one in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy. . . . It must be one that society is prepared to recognize as reasonable. . . . Legitimate expectations of privacy derive from concepts of real or personal property law or [from] understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others . . . and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. . . . Of course, one need not have an untrammeled power to admit and exclude in order to claim the protection of [article first, § 7, as] long as the place involved is one affording an expectation of privacy that society regards as reasonable. . . .

"Additional principles guide our analysis of the [defendant's] claim, chief among them the bedrock principle that [p]rivacy expectations are . . . highest and are accorded the strongest constitutional protection in the case of a private home and the area immediately surrounding it. . . . It is also axiomatic that a search or seizure conducted without a warrant issued upon probable cause is presumptively unreasonable." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Kono*, supra, 324 Conn. 90–91. Because "[o]ur constitutional preference for warrants reflects a goal of protecting citizens from unjustified police intrusions by interposing a neutral [decision maker] between the police and the object of the proposed search"; *State* v. *Miller*, 227 Conn. 363, 382, 630 A.2d 1315 (1993); that preference "is overcome only in specific and limited circumstances." (Internal quotation marks omitted.) *State* v. *Kono*, supra, 91.

State *v.* Correa

"Finally, [i]n determining the contours of the protections provided by our state constitution, we employ a multifactor approach . . . . The factors that we consider are (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms [otherwise described as public policies]. . . . We have noted, however, that these factors may be inextricably interwoven, and not every [such] factor is relevant in all cases."[17] (Citation omitted; internal quotation marks omitted.) Id., 92. Because this court, in *State* v. *Kono*, supra, 324 Conn. 80, recently considered the state constitutional implications of a canine sniff conducted in the related context of a multiunit condominium complex, our resolution of the present claim is informed primarily by our reasoning and analysis in *Kono*. We also take into account, of course, relevant case law pertaining to the nature of one's right of privacy in a motel room, as distinguished from a home or permanent residence.

In support of his contention of a constitutional violation, the defendant relies principally on *Kono*, in which

---

[17] We consider these factors "mindful that state [c]onstitutional provisions must be interpreted within the context of the times. . . . We must interpret the constitution in accordance with the demands of modern society or it will be in constant danger of becoming atrophied and, in fact, may even lose its original meaning. . . . [A] constitution is, in [former United States Supreme Court] Chief Justice John Marshall's words, intended to endure for ages to come . . . and, consequently, to be adapted to the various crises of human affairs. . . . In short, the [state] constitution was not intended to be a static document incapable of coping with changing times. It was meant to be, and is, a living document with current effectiveness. . . . The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." (Internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 406 n.38, 119 A.3d 462 (2015).

State *v.* Correa

we were required to decide whether the defendant, Dennis Kono, was entitled to the suppression of certain evidence seized from his condominium following a warrantless canine sniff conducted by the police just outside of the door to the condominium. See id., 82. In that case, the police decided to conduct the search after receiving an anonymous tip that Kono was growing marijuana in his condominium, which was one of thirty-four such units situated on the first two floors of the complex in which Kono resided. Id., 83. The outside doors of the complex were normally locked, with access to the complex gained through a keypad. Id., 83–84. The police, however, were allowed entry to the complex by the property manager, who, at the request of the police, had signed a consent form permitting them to conduct a canine examination of the complex's common areas. Id., 83. A police canine handler, accompanied by a trained drug detection dog, walked through the common hallway located on each of the first two floors of the complex, and the handler directed the dog to sniff at the bottom of the front door of the units on both floors. See id., 84. The dog alerted following his sniff at the door to Kono's unit and, after knocking on Kono's door with no response, the police sought and obtained a search warrant for the unit on the basis of the results of the canine sniff. Id. Upon executing the warrant, the police discovered an indoor greenhouse containing marijuana plants, lighting equipment and several firearms, and Kono, thereafter, was charged with various drugs offenses and illegal possession of an assault weapon. Id.

Kono subsequently filed a motion to suppress the evidence seized from his unit, claiming that the canine sniff of the threshold of his home was a search under both the fourth amendment and article first, § 7, of the state constitution and, therefore, that a warrant based on probable cause was required. Id., 84–85. The trial

State *v.* Correa

court agreed with the defendant that the warrantless
canine sniff was a search that violated his reasonable
expectation of privacy protected by the fourth amend-
ment and granted the motion to suppress.[18] Id., 85.
Because none of the state's evidence would have been
admissible against the defendant at trial in light of the
court's ruling on the defendant's motion, the court
granted the defendant's motion to dismiss the charges.
Id., 89.

The state appealed, and we reached the same conclu-
sion as the trial court, albeit under article first, § 7.[19]
Id., 82, 122. After observing that "[p]rivacy expectations
are . . . highest and are accorded the strongest consti-
tutional protection in the case of a private home and the
area immediately surrounding it"; (internal quotation
marks omitted) id., 91; we disagreed with the state that
the canine sniff was constitutionally innocuous merely
because the police had received permission to enter
the complex. See id., 109. In reaching that conclusion,
we explained that the critical consideration was not
where the canine sniff took place but, rather, the fact
that Kono's condominium was the object of the canine
sniff. See id., 112–14. In this regard, we agreed with the
trial court, which, as we explained, had "rejected the
state's contention that a [search] warrant was not
required because [t]he police were lawfully present in
the common hallway outside [Kono's] front door, an
area where, in the state's view, [Kono] had no reason-
able expectation of privacy or any property interest
sufficient to protect against the officers' warrantless

---

[18] The trial court did not reach Kono's state constitutional claim in light
of its determination that the canine sniff violated Kono's rights under the
fourth amendment. *State* v. *Kono*, supra, 324 Conn. 85.

[19] We did not address Kono's fourth amendment claim because we con-
cluded, first, that it was appropriate to begin by considering his claim under
the state constitution; see *State* v. *Kono*, supra, 324 Conn. 82–83 n.3; and,
second, that he was entitled to relief under article first, § 7, thereby making
it unnecessary to consider his federal constitutional claim. See id., 104, 122.

State *v.* Correa

intrusion. . . . [I]t was immaterial that the police were lawfully present in the hallway, or that [Kono] had a diminished expectation of privacy in the common areas of his condominium complex, because the privacy interest at stake did not relate to those areas but, rather, to the inside of [Kono's] home.'' (Internal quotation marks omitted.) Id., 88. In this regard, we also relied on the fact that, in *Florida* v. *Jardines*, 569 U.S. 1, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013), the United States Supreme Court concluded that a canine sniff conducted by the police at the front door of a home was a search protected by the fourth amendment, even though the police, no less than any other visitor, generally were free to enter the homeowner's property and to approach the front door.[20] See id., 8–10; see also *State* v. *Kono*, supra, 324 Conn. 112.

We also were unpersuaded by the state's argument that the canine sniff was not a search because the sniff reveals only the existence of contraband, and Kono had no reasonable expectation of privacy in any such contraband inside his condominium. *State* v. *Kono*, supra, 324 Conn. 111–12. Although acknowledging that the United States Supreme Court had considered the fact that a canine sniff reveals nothing but contraband in concluding that that investigative technique is not a search within the meaning of the fourth amendment when directed at a motor vehicle subject to a lawful traffic stop; *Illinois* v. *Caballes*, 543 U.S. 405, 408–10, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005); or luggage at a public airport; *United States* v. *Place*, 462 U.S. 696, 707, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983); we explained that the privacy interest in one's home is considerably

---

[20] As we discuss more fully in this opinion, the court's holding in *Jardines* was predicated on the fact that the canine sniff at issue in that case was performed by the police canine within the curtilage of the home of the defendant without his explicit or implicit permission. *Florida* v. *Jardines*, supra, 569 U.S. 5–6.

State *v.* Correa

greater than the privacy interest in one's automobile or luggage at an airport. *State* v. *Kono*, supra, 109–13. Explaining that "this distinction between searches of the home and searches of locations outside [of] the home is consistent with the established priorities of article first, § 7, of the Connecticut constitution"; id., 113; and underscoring this state's long-standing constitutional preference for warrants; id.; we agreed with Kono that, for purposes of the state constitution, the canine sniff of his condominium was a search requiring a warrant founded on probable cause.[21] Id., 122.

In addition to *Kono*, the defendant also relies on this court's recognition in *State* v. *Benton*, 206 Conn. 90, 536 A.2d 572, cert. denied, 486 U.S. 1056, 108 S. Ct. 2823, 100 L. Ed. 2d 924 (1988), that "[p]ersons . . . residing in an apartment, or persons staying in a hotel or motel have the same fourth amendment rights to protection from *unreasonable* searches and seizures and the same *reasonable* expectation of privacy as do the residents of any dwelling." (Emphases in original.) Id., 95; see also *Stoner* v. *California*, 376 U.S. 483, 490, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964) ("[n]o less than a tenant of a house, or the occupant of a room in a boarding house . . . a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures" (citation omitted)); *United States* v. *Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) ("[a] person staying in a motel room has the same constitutional protection against unreasonable searches of that room as someone in his or her own home" (internal quotation marks omitted)); *United States* v. *Stokes*, supra, 443 n.7 ("[h]otel guests retain a legitimate expectation of

_____

[21] As we explain in part III of this opinion, in *Kono*, the state did not claim that a lesser standard than probable cause, such as a reasonable and articulable suspicion, would suffice for state constitutional purposes in the event we concluded, contrary to the state's contention, that the canine sniff at issue in that case was a search protected by article first, § 7. See *State* v. *Kono*, supra, 324 Conn. 86 n.4, 122 n.21.

State *v.* Correa

privacy in the hotel room and in any articles located in their hotel room for the duration of their rental period''); *State* v. *Jackson*, 304 Conn. 383, 397, 40 A.3d 290 (2012) (''[a] person who has rented a hotel room generally has a reasonable expectation of privacy in that location''). In *Benton*, the police suspected that the defendant, Leonard R. Benton, was engaged in illegal narcotics activity, and, as part of their investigation into that activity, a police detective who was present in the apartment immediately adjacent to Benton's apartment overheard certain incriminating conversations. *State* v. *Benton*, supra, 94. It was undisputed that the detective had gained entry into that adjacent apartment with the permission of the tenant and, further, that the detective heard the conversations without the aid of any sensory enhancing devices. Id. Citing to the general rule that ''what a government agent perceives with his or her unaided senses, when lawfully present in a place where he or she has a right to be, is not an illegal search under the fourth amendment''; id.; we rejected Benton's claim that the eavesdropping violated his federal constitutional rights. Id., 94–96. As we explained, ''[c]onversations carried on in any type of residence, or anywhere for that matter, in a tone audible to the unaided ear of a person located in a place where that person has a right to be, and where a person can be expected to be, are conversations knowingly exposed to the public. . . . [Such] [c]onversations . . . are not within the penumbra of fourth amendment protection.'' (Citations omitted.) Id., 96. We also expressly acknowledged, however, that the right of an apartment dweller or motel guest to be free from unreasonable searches and seizures ''honors the justifiable expectation that if their conversations are conducted in a manner undetectable outside their room or residence by the electronically unaided ear they will not be intercepted.'' Id., 95–96. Accordingly, the defendant contends that our holding

State *v.* Correa

in *State* v. *Kono*, supra, 324 Conn. 122, that a canine sniff targeted at a condominium located in a multiunit condominium complex is a search for which a warrant is required, also applies to a motel room.

Applying the principles that we found to be determinative in *Kono*, we agree with the defendant that the protection against a canine sniff afforded under the state constitution to a resident of a multiunit condominium complex also extends to the occupant of a motel room. As we explain more fully in this opinion in addressing the state's contrary arguments, we are not persuaded that the differences between the motel room at issue in the present case and the condominium unit at issue in *Kono* are weighty enough to justify a different result.

In support of its contention that a canine sniff conducted immediately outside a motel room door is not a search, the state cites to a number of cases holding that the occupant of a motel room has a diminished expectation of privacy as compared to the resident of a home. In particular, the state, like the defendant, relies on *State* v. *Benton*, supra, 206 Conn. 90, in which we observed that "[t]he shared atmosphere and the nearness of one's neighbors in a hotel or motel or apartment in a multiple family dwelling . . . diminish the degree of privacy that one can reasonably expect or that society is prepared to recognize as reasonable." Id., 96. We supported this assertion in *Benton* with citations to several cases, including *United States* v. *Mankani*, 738 F.2d 538 (2d Cir. 1984), in which the United States Court of Appeals for the Second Circuit observed that, "[u]nlike an apartment or a room in a boarding house, hotels and motels are not ordinarily considered places where one lives and keeps personal effects. In addition, service personnel in hotels and motels have keys to enter and make-up the rooms, remove dishes, check air-conditioning, heating and the like. Former occu-

State *v.* Correa

pants may even have retained a key to a hotel room.
. . . In short, it is the transitory nature of such places,
commonly understood as such, that diminishes a person's justifiable expectation of privacy in them. Since
a hotel room is exposed to others, it is unlike a house,
[that is], a place where one lives.'' (Internal quotation
marks omitted.) Id., 544; see also *State* v. *Benton*,
supra, 95–96.

Similarly, in *United States* v. *Agapito*, 620 F.2d 324
(2d Cir.), cert. denied, 449 U.S. 834, 101 S. Ct. 107, 66
L. Ed. 2d 40 (1980), the court explained that, ''[d]espite
the fact that an individual's [f]ourth [a]mendment rights
do not evaporate when he rents a motel room, the extent
of the privacy he is entitled to reasonably expect may
very well diminish. For although a motel room shares
many of the attributes of privacy of a home, it also
possesses many features [that] distinguish it from a
private residence . . . . A private home is quite different from a place of business or a motel cabin. A home
owner or tenant has the exclusive enjoyment of his
home, his garage, his barn or other buildings, and also
the area under his home. But a transient occupant of
a motel must share corridors, sidewalks, yards, and
trees with the other occupants. Granted that a tenant
has standing to protect the room he occupies, there is
nevertheless an element of public or shared property
in motel surroundings that is entirely lacking in the
enjoyment of one's home.'' (Internal quotation marks
omitted.) Id., 331.

The state also notes that, in light of this reduced
expectation of privacy in a motel room as distinguished
from a private home, a significant number of courts
have held that a canine sniff of a door in a motel hallway
does not constitute a search. See *United States* v. *Legall*,
585 Fed. Appx. 4, 5–6 (4th Cir. 2014) (concluding that
canine sniff of hotel room did not violate fourth amendment because police did not enter curtilage of room

State *v.* Correa

and did not infringe on defendant's reasonable expectation of privacy insofar as canine sniff disclosed only presence of illegal narcotics in which defendant had no legitimate expectation of privacy), cert. denied, 574 U.S. 1183, 135 S. Ct. 1471, 191 L. Ed. 2d 415 (2015); *United States* v. *Roby*, 122 F.3d 1120, 1124–25 (8th Cir. 1997) (because canine sniff "could reveal nothing about noncontraband items" and odor of marijuana was in "plain smell" of dog, and because defendant had no reasonable expectation of privacy in hallway outside his hotel room, canine sniff conducted in hotel hallway was not search for fourth amendment purposes (internal quotation marks omitted)); *United States* v. *Lewis*, Docket No. 1:15-CR-10 (TLS), 2017 WL 2928199, *8 (N.D. Ind. July 10, 2017) (because officers conducting canine sniff in open-air walkway of motel were entitled to be in that location and sniff could not reveal any information other than presence of illegal narcotics, sniff did not violate defendant's legitimate privacy expectations, and, therefore, defendant's fourth amendment rights were not implicated); *United States* v. *Marlar*, 828 F. Supp. 415, 419 (N.D. Miss. 1993) (because canine sniff revealed odors that were outside of motel room and officer had right to be on public sidewalk adjacent to defendant's motel room, canine sniff did not violate defendant's reasonable expectation of privacy protected by fourth amendment), appeal dismissed, 68 F.3d 464 (5th. Cir. 1995); *State* v. *Foncette*, 238 Ariz. 42, 45–46, 356 P.3d 328 (2015) (because officers were legally present in hotel hallway and canine sniff discloses only presence of contraband, sniff was not search for fourth amendment purposes); *Nelson* v. *State*, 867 So. 2d 534, 536–37 (Fla. App. 2004) (because officers conducting canine sniff of hotel hallway were entitled to be in hallway and "evidence in the plain smell may be detected without a warrant," sniff did not violate defendant's reasonable expectation of privacy under fourth

State *v.* Correa

amendment), review denied, 115 So. 3d 1001 (Fla. 2013); *People* v. *Lindsey*, Docket No. 124289, 2020 WL 1880802, *1 (Ill. April 16, 2020) (canine sniff in alcove outside of motel room was not search under fourth amendment because sniff revealed odors in alcove only, not inside of motel room), cert. denied, U.S. , 141 S. Ct. 2476, 209 L. Ed. 2d 534 (2021); *Wilson* v. *State*, 98 S.W.3d 265, 272–73 (Tex. App. 2002, pet. ref'd) (because exterior door of hotel room was open to public and canine sniff revealed nothing about room but presence of cocaine, sniff was not search for fourth amendment purposes); *Sanders* v. *Commonwealth*, 64 Va. App. 734, 755, 772 S.E.2d 15 (2015) (because police officers conducting canine sniff in motel walkway had right to be in that location and sniff did not reveal any information other than presence of contraband, there was no violation of defendant's reasonable expectation of privacy under fourth amendment).

As the state acknowledges, however, these cases have focused primarily on two principles: first, that, because a canine sniff detects only the presence of illegal narcotics, it does not infringe on any legitimate expectation of privacy; see, e.g., *Illinois* v. *Caballes*, supra, 543 U.S. 408–10 (canine sniff of motor vehicle does not implicate fourth amendment because there can be no expectation of privacy in contraband that society deems reasonable); *United States* v. *Place*, supra, 462 U.S. 707 (because canine sniff of luggage in airport "does not expose noncontraband items that otherwise would remain hidden from public view," it is not search); and, second, customarily, the walkway or hallway of a motel is a location where the police, no less than the general public, are entitled to be, and that undisputedly was the case here. But cf. *Florida* v. *Jardines*, supra, 569 U.S. 11 ("[t]hat the officers learned what they learned only by physically intruding on [the defendant's] property to gather evidence is enough to

State *v.* Correa

establish that a search occurred''). As we previously
explained in *Kono*, however, at least for purposes of the
state constitution, the United States Supreme Court's
decisions in *Caballes* and *Place* are distinguishable from
cases involving a canine sniff of a door to an apartment
''because a canine sniff of a residence is entitled to
significantly more protection than a canine sniff of an
automobile or a piece of luggage at a public airport.''
*State* v. *Kono*, supra, 324 Conn. 112; see also *Florida* v.
*Jardines*, supra, 12–13 (Kagan, J., concurring) (canine
sniff of front door of single-family residence violates
reasonable expectation of privacy). We also empha-
sized that ''the question of lawful physical presence is
distinct from the question of whether a canine sniff of
the exterior of a person's home impermissibly invades
reasonable expectations of privacy *in* the home.'' (Empha-
sis added.) *State* v. *Kono*, supra, 109.

The state maintains that these principles, applicable
to apartments and condominiums under *Kono*, are inap-
plicable to motel rooms for four primary reasons, none
of which we find sufficiently convincing to persuade
us that the canine sniff of the defendant's motel room
was not a search subject to the protections of article
first, § 7. First, the state asserts that, in contrast to an
apartment, a motel room most often serves merely as
transitory quarters rather than a private, permanent
residence.[22] Although we agree generally with this

_____

[22] It is important to note, however, that, for some, a motel room *is* home,
either temporarily or, in some cases, indefinitely or even permanently.
Indeed, there is some evidence in the record to suggest that the defendant
or Taveras or both were living at the motel at the time of the canine sniff.
See part I of this opinion. Asserting that he was, in fact, residing there at
that time, the defendant contends that his ''living situation was therefore
like many others who must live in a motel when they have no [other]
place to stay.'' ''Distinguishing motel rooms from apartments is problematic
because it affords less protection and privacy rights to people whose motel
room is their only home.'' ''Individuals, such as the defendant, and families
struggling to keep a roof over their heads, should not be stripped of constitu-
tional protections simply because they must live in a motel.'' To support
this contention, the defendant cites to *Kono*, in which we recognized the

State *v.* Correa

observation, it is well settled that motel guests, like home dwellers, have a reasonable expectation of privacy in their rooms. See, e.g., *Stoner* v. *California*, supra, 376 U.S. 490; *State* v. *Benton*, supra, 206 Conn. 95. The fact that a motel is not a home when, as is ordinarily the case, a stay there is temporary, does not, ipso facto, establish the scope of the privacy that transient motel guests reasonably may expect. We believe, rather, that, in order to establish a reduced expectation of privacy in a particular motel room, the state must point to some specific attribute of the room that makes the type of intrusion at issue reasonable, even though that same intrusion would be unlawful if directed at a private home. Indeed, this court previously has recognized that those aspects of a hotel or motel that reduce a guest's expectations of privacy but do not increase the vulnerability of guests *to the particular type of intrusion at issue* are irrelevant in assessing the legality of that intrusion. See *State* v. *Benton*, supra, 96 ("[t]he type of dwelling is inconsequential except insofar as its physical attributes increase the vulnerability of its occupants to eavesdropping by the unaided ear"). If it were otherwise, the only guidance that courts would have in determining whether certain conduct by the police constituted an unlawful search of a motel room would be the vague and conclusory statement that motel guests have a diminished expectation of privacy as compared to residents of private homes. In the present case, although the transitory nature of motel stays

_____

manifest injustice of allowing warrantless canine sniffs of the doors of apartments or other multiunit dwellings but not freestanding homes because doing so would effectively result in the allocation of constitutional protections on the basis of income, race, and ethnicity. See *State* v. *Kono*, 324 Conn. 121–22. Although we acknowledge the persuasive force of the defendant's argument, we need not determine the extent to which it might otherwise bear on our resolution of the present case in light of our determination, for the other reasons set forth in this opinion, that a canine sniff of the door to a motel room is a search within the meaning of article first, § 7, of the state constitution.

State *v.* Correa

may render guests more vulnerable to warrantless intrusions in some instances or respects; see, e.g., *State* v. *Jackson*, supra, 304 Conn. 398 (hotel guest has no reasonable expectation of privacy in her room when she has left room with no intent to return); we do not agree with the state that it inevitably does so irrespective of the circumstances.

This court's observation in *Benton* also belies the state's second argument that, unlike an apartment, motel guests generally do not keep their personal effects in a motel room. Again, such guests ordinarily do not keep *all* of their personal effects in their rooms because a motel room frequently is a temporary accommodation or lodging and not the guest's permanent residence. That fact, however, does not mandate the conclusion that the personal effects that guests often *do* keep there—no matter how private or personal they may be—should be subject to appreciably less protection under the law. On the contrary, we see no reason why a motel guest reasonably cannot expect a degree of privacy in his or her room sufficient to preclude random or arbitrary intrusions by the police.

The state next maintains that, as we observed in *State* v. *Benton*, supra, 206 Conn. 96, "[t]he shared atmosphere and the nearness of one's neighbors" in a motel setting reduce the extent to which a motel guest reasonably may expect to retain his or her complete privacy. We acknowledge that this attribute of a motel and its rooms may diminish a guest's expectations of privacy in some respects. For example, we observed in *Benton* that mere unaided eavesdropping on audible conversations from an adjacent motel room is not a search. See id., 96–97. Similarly, if a guest does not make any effort to ensure that motel staff do not enter his room for cleaning or maintenance when he is not there, and the staff discovers evidence of illegal activity in the course of performing those tasks, the guest has no legitimate

State *v.* Correa

reason to complain. We do not agree, however, that a
room occupied by a motel guest is more vulnerable to
a warrantless canine sniff than an apartment, condo-
minium or house simply because other guests occupy
nearby rooms or because the rooms may be entered by
motel staff to perform certain functions unless guests
place a "Do Not Disturb" sign on the door.[23]

We also disagree with the state's final contention,
namely, that the canine sniff was not a search under
*Kono* because it occurred in an open-air walkway that
was fully accessible to the public, whereas the sniff
in *Kono* occurred in an interior corridor of a locked
apartment building. See *State* v. *Kono*, supra, 324 Conn.
83–84. It is true that, in certain circumstances, an open-
air walkway may make the activities in or the contents
of a motel room more readily subject to detection, such
as by simple visual surveillance or unaided eaves-
dropping, than those of an apartment that is accessible
only by way of a locked or enclosed corridor. As we
explained, however, this court rejected the state's claim
in *Kono* that a warrantless canine sniff of the hallway
adjacent to an apartment is undeserving of constitu-
tional protection because a tenant reasonably can
expect police officers, no less than members of the
public generally, to gain access there, stating that, for
purposes of the state constitution, a tenant's "lack of
a reasonable expectation of complete privacy in the
hallway does not also mean that he had no reasonable
expectation of privacy against persons in the hallway
snooping into his apartment using sensitive devices not
available to the general public." (Internal quotation
marks omitted.) *State* v. *Kono*, supra, 324 Conn. 114;

---

[23] No doubt there are other attributes of a motel that may, depending on
the circumstances, serve to diminish the legitimate privacy expectations of
its guests. The state has not identified any, however, and we are aware of
none, that cause us to conclude that a motel guest's reasonable privacy
interest in his or her room is so relatively inconsequential as to exempt a
canine sniff of the exterior of that room from constitutional scrutiny.

State *v.* Correa

see also id., 109 (lawful presence of police located immediately outside door of home is not determinative of whether canine sniff conducted at that location violates homeowner's reasonable expectation of privacy). We see no reason why the fact that the police in the present case were lawfully present in an open-air walkway abutting the defendant's motel room makes any appreciable difference with respect to this analysis. The relevant question is not how easy it may be to gain lawful access to the door of a particular dwelling or lodging, but what conduct those occupying that space reasonably may expect from persons who actually have such access. Thus, as we stated in *Kono*, an apartment dweller's "lack of a right to exclude [others from access to common areas does] not mean [that] he [has] no right to expect certain norms of behavior in his apartment hallway. [To be sure], other [apartment] residents and their guests (and even their dogs) can pass through the hallway. They are not entitled, though, to set up chairs and have a party in the hallway right outside the door. Similarly, the fact that a police officer might lawfully walk by and hear loud voices from inside an apartment does not mean [that] he could put a stethoscope to the door to listen to all that is happening inside." (Internal quotation marks omitted.) Id., 113–14.

Significantly, in *Florida* v. *Jardines*, supra, 569 U.S. 1, the United States Supreme Court employed similar reasoning in concluding that the fourth amendment prohibits the police from conducting a warrantless canine sniff at the front door of a private home. See id., 8–9, 11–12. Although the court decided the case on the basis of common-law property principles and therefore had no need to apply the reasonable expectation of privacy test; see id., 5–6, 11; its analysis nevertheless bears on the claim at issue in the present case. After first observing that "the knocker on the front door [of a home] is treated as an invitation or license to attempt an entry,

State *v.* Correa

justifying ingress to the home by solicitors, hawkers
and peddlers of all kinds''; (internal quotation marks
omitted) id., 8; the court continued: ''This implicit
license typically permits the visitor to approach the
home by the front path, knock promptly, wait briefly
to be received, and then (absent invitation to linger
longer) leave. Complying with the terms of that tradi-
tional invitation does not require fine-grained legal
knowledge; it is generally managed without incident by
the [n]ation's Girl Scouts and trick-or-treaters. Thus, a
police officer not armed with a warrant may approach
a home and knock, precisely because that is no more
than any private citizen might do.'' (Footnote omitted;
internal quotation marks omitted.) Id. As the court fur-
ther explained, however, that license does not extend
to a canine sniff: ''But introducing a trained police dog
to explore the area around the home in hopes of dis-
covering incriminating evidence is something else.
There is no customary invitation to do *that.* . . . To
find a visitor knocking on the door is routine (even
if sometimes unwelcome); to spot that same visitor
exploring the front path with a metal detector, or
marching his bloodhound into the garden before saying
hello and asking permission, would inspire most of us
to—well, call the police. The scope of a license—
express or implied—is limited not only to a particular
area but also to a specific purpose. . . . [T]he back-
ground social norms that invite a visitor to the front
door do not invite him there to conduct a search.''
(Emphasis in original; footnote omitted.) Id., 9. Despite
the differences between a motel room and a home,
similar norms apply to the conduct of visitors lawfully
on motel property: motel guests reasonably do not
expect that the foot traffic generally associated with
an open-air walkway abutting the motel's guestrooms
includes law enforcement officers trolling the walkway
with a trained police dog in search of contraband in
those rooms.

State *v.* Correa

We note, in addition, that, if the state were correct that a canine sniff of the exterior door of a motel room is an event altogether lacking in constitutional significance, the police would be entitled to roam through the corridors of a motel conducting canine sniffs of some or all of the doors to those rooms despite having no particularized cause to believe that any of them contained drugs. In tacit acknowledgment that our citizenry would find this conduct unacceptable, the state asserts that there is no reason to believe that the police in Connecticut would engage in such a trawling exercise, even though they could do so lawfully. Even if we shared the state's confidence in that regard, however, the fact that it would be legally permissible for the police to go from door to door conducting suspicionless canine sniffs throughout the motel is itself reason to doubt the soundness of the state's constitutional argument. Cf. *State* v. *Kono*, supra, 324 Conn. 115 (expressing concern, in context of canine sniff conducted at front door of condominium located in multiunit condominium complex, "that, if police officers are permitted to conduct warrantless canine [sniffs] of people's homes, there is nothing to prevent [them] from applying the procedure in an arbitrary or discriminatory manner, or based on whim and fancy, at the home of any citizen, and that [s]uch an open-ended policy invites overbearing and harassing conduct" (internal quotation marks omitted)).

The state's reliance on *United States* v. *Hayes*, 551 F.3d 138 (2d Cir. 2008), to support its claim to the contrary is misplaced. In *Hayes*, the police conducted a canine sniff of the property surrounding the outside perimeter of the home of the defendant, Derrick Hayes, and the dog alerted to a bag of illegal drugs located in scrub brush, about ten to fifteen feet thick, approximately sixty-five feet from the back door of the house and on the border of the neighboring property. Id., 141–

State *v.* Correa

42, 145. Hayes sought to suppress the drugs on the ground that the canine sniff constituted an unlawful warrantless search. Id., 142. The court concluded that Hayes "had no legitimate expectation of privacy in the front yard of his home insofar as the presence of the scent of narcotics in the air was capable of being sniffed by the police canine," primarily because the "front yard where the dog sniff occurred was clearly within plain view of the public road and adjoining properties" and the "canine's sense of smell was directed [toward] an area [sixty-five] feet behind the back door of the home." Id. 145. The court also explained that the decision of the United Statutes Supreme Court in *Kyllo* v. *United States*, 533 U.S. 27, 40, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001), holding that the use of a thermal imaging device to detect temperature variations inside a home was an unreasonable search in violation of the fourth amendment, and the decision of the United States Court of Appeals for the Second Circuit in *United States* v. *Thomas*, 757 F.2d 1359, 1367 (2d Cir.), cert. denied sub nom. *Fisher* v. *United States*, 474 U.S. 819, 106 S. Ct. 66, 88 L. Ed. 2d 54 (1985), and cert. denied sub nom. *Wheelings* v. *United States*, 474 U.S. 819, 106 S. Ct. 67, 88 L. Ed. 2d 54 (1985), and cert. denied sub nom. *Rice* v. *United States*, 479 U.S. 818, 107 S. Ct. 78, 93 L. Ed. 2d 34 (1986), holding that a canine sniff of the door to an apartment was an unlawful search, were distinguishable because, in those cases, the police were trying to detect information *inside* of the defendant's home. *United States* v. *Hayes*, supra, 145. Thus, the court left open the possibility that initiating a canine sniff to detect odors emanating from inside of a home would violate the homeowner's reasonable expectations of privacy, even if the sniff occurred at a location that was in plain view of the public and in which the subject of the search had no legitimate expectation of privacy. In any event, it clearly is not the case that every war-

State *v.* Correa

rantless canine sniff of a dwelling that occurs within plain view of adjacent roads or parking lots is lawful; see, e.g., *Florida* v. *Jardines*, supra, 569 U.S. 4, 11–12 (warrantless canine sniff on front porch of private dwelling is search for fourth amendment purposes); and *Hayes* provides no guidance on the issue of whether the common walkway area immediately adjacent to a motel room door is more analogous to the open yard of a private home, which was the situation in *Hayes*, or to the home's front porch, as was the case in *Jardines*.[24]

For all the foregoing reasons, we conclude that the canine sniff of the exterior door to the defendant's motel room was a search for purposes of article first, § 7. The state nevertheless contends that, insofar as the canine sniff was a search, it was reasonable and, therefore, lawful under that state constitutional provision. We therefore turn to that issue.

## III

## WARRANT REQUIREMENT

The state claims that, even if the canine sniff of the door to the defendant's motel room was a search, it passes muster under article first, § 7, because it was supported by a reasonable and articulable suspicion that there were illicit drugs in the room. In the state's

---

[24] In *Kono*, this court did not address the issue of whether the area immediately in front of the door to an apartment is analogous to curtilage for purposes of article first, § 7, of the state constitution, resolving the case instead on the basis of the defendant's reasonable expectation of privacy. See *State* v. *Kono*, supra, 324 Conn. 94 n.10. But see id., 104 (federal precedent supports conclusion that warrantless canine sniff of door to apartment inside multiunit building is unlawful search "whether the defendant's claim is reviewed under the . . . line of privacy based decisions [originating with *Katz* v. *United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)] or under the principles of curtilage on which the court in *Jardines* relied"). We also need not express an opinion as to whether the area immediately adjacent to an apartment or a motel room is analogous to curtilage. We conclude only that *Hayes* is inapposite because it sheds no light on that issue.

State *v.* Correa

view, a warrant predicated on probable cause is not required for a canine sniff of the exterior door to a motel room; rather, the state maintains, the requirements of article first, § 7, are satisfied if such a search is founded on a reasonable and articulable suspicion. We disagree with the state that a warrant is not required in such circumstances.[25]

As the state observes, and as we recognized in *State* v. *Kono*, supra, 324 Conn. 116–17, a number of courts have concluded that a canine sniff of the door of an apartment or condominium in a multiunit building is a lawful search if it is based on a reasonable and articulable suspicion rather than on probable cause. See *Fitzgerald* v. *State*, 384 Md. 484, 512, 864 A.2d 1006 (2004) (declining to decide whether canine sniff of door to apartment was search under Maryland constitution because, even if it was, police had reasonable and articulable suspicion to conduct canine sniff, which is all that is required); *State* v. *Davis*, 732 N.W.2d 173, 181–82 (Minn. 2007) (reasonable and articulable suspicion is needed under Minnesota constitution to conduct canine sniff immediately outside apartment door); *State* v. *Ortiz*, 257 Neb. 784, 796, 600 N.W.2d 805 (1999) (only reasonable and articulable suspicion is needed under Nebraska constitution); *People* v. *Dunn*, 77 N.Y.2d 19, 25–26, 564 N.E.2d 1054, 563 N.Y.S.2d 388 (1990) (only reasonable and articulable suspicion is needed under New York constitution), cert. denied, 501 U.S. 1219, 111 S. Ct. 2830, 115 L. Ed. 2d 1000 (1991); see also *Hoop* v. *State*, 909 N.E.2d 463, 469–70 (Ind. App. 2009) (reasonable suspicion is required under Indiana constitution before conducting canine sniff of private residence in

---

[25] The defendant contends that, prior to the canine sniff, the police did not have a reasonable and articulable suspicion that the motel room contained illegal drugs. For present purposes, we may assume, as the state maintains, that the police did have a reasonable and articulable suspicion that there were such drugs in the room.

State *v.* Correa

order to restrict arbitrary police action). Like the courts that have held that a canine sniff outside the door to a motel or hotel room is not a search, the courts that have held that a sniff outside the door to an apartment is lawful if supported by a reasonable and articulable suspicion have reasoned that a canine sniff is minimally intrusive because it detects only illegal drugs, that it occurs in a place where the police are lawfully entitled to be, and that it is an investigative technique of significant utility to the police. See *Fitzgerald* v. *State*, supra, 510 (noting nonintrusive nature of search and its significant value to police); *State* v. *Davis*, supra, 179–82 (noting that police were in location where they were entitled to be, that canine sniff is minimally intrusive, and that sniff has significant utility to police); *State* v. *Ortiz*, supra, 794–96 (canine sniff of threshold to apartment that is supported by reasonable and articulable suspicion is lawful if police are entitled to be where sniff occurred because of nonintrusive nature of sniff); *People* v. *Dunn*, supra, 26 (noting nonintrusive nature of canine sniff and its significant value to police).

The state also notes that, in *State* v. *Waz*, 240 Conn. 365, 692 A.2d 1217 (1997), this court, assuming that subjecting a mail parcel in the possession of the United States Postal Service to a canine sniff was a search, held that the search was lawful under article first, § 7, because it was based on a reasonable and articulable suspicion. Id., 383–84. Similarly, in *State* v. *Torres*, 230 Conn. 372, 645 A.2d 529 (1994), this court, without deciding whether a canine sniff of the exterior of a car following a traffic stop is a search, held that it was lawful for the same reason, that is, because it was supported by a reasonable and articulable suspicion. Id., 381–82.

As we noted previously; see footnote 21 of this opinion; in *Kono*, the state's sole claim was that the canine sniff of the front door of the condominium unit at issue

State *v.* Correa

was not a search and, therefore, the police were free
to conduct the sniff without a warrant and without
any reason to believe that there were drugs inside the
condominium. See *State* v. *Kono*, supra, 324 Conn. 89.
The state made no claim in *Kono* that, in the event we
were to conclude that the canine sniff *was* a search,
the use of that technique by the police nevertheless
satisfied constitutional requirements because it was
supported by a reasonable and articulable suspicion.
See id., 86 n.4, 122 n.21. Having had no occasion to
address that issue, we also had no reason to deviate
from the general rule that, under article first, § 7, a
search is lawful only if it has been authorized by a
warrant founded on probable cause. E.g., id., 91 (search
conducted without warrant issued upon probable cause
is presumptively unreasonable). We gave no indication
in *Kono*, however, that we believed that condominiums
and apartments are meaningfully distinguishable from
private homes in regard to the cause necessary to justify
a canine sniff of those dwellings. On the contrary, our
analysis in *Kono* belies any such suggestion. First, as
we already explained, in *Kono*, this court rejected the
state's arguments that a canine sniff of an apartment
is not a search because it reveals only the presence of
illegal drugs; see id., 109–12; and that it is not unlawful
if performed in a place where the police were entitled
to be; see id., 109; because an apartment, like a private
residence, is a home. We also explained that distinguish-
ing between single-family dwellings and dwellings in
a multiunit building in this context "would be deeply
troubling because it would apportion [constitutional]
protections on grounds that correlate with income,
race, and ethnicity." (Internal quotation marks omit-
ted.) Id., 121. We further stated, with respect to those
state courts that have concluded that a canine sniff of
the front door of a single-family home requires a warrant
supported by probable cause, that, "[b]ecause these

State *v.* Correa

courts based their rulings on the reasonable expectation of privacy test recognized in *Katz* [v. *United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)], their holdings logically would extend to *all residences* within their states.'' (Emphasis added.) *State* v. *Kono*, supra, 117. Moreover, in citing Justice Kagan's concurring opinion in *Jardines* with approval, we, like Justice Kagan, placed our imprimatur on the principle that any action taken by the police vis-à-vis a home that is sufficiently invasive to constitute a search, including a canine sniff of the door to the home, implicates the reasonable expectations of privacy of those residing in the home and, in the absence of exigent circumstances, requires a warrant that must be supported by probable cause.[26] Id., 99 (indicating that, as Justice Kagan suggested in her concurrence in *Jardines*, warrantless search of home is never constitutional in absence of exigent circumstances because such search invades heightened privacy expectations in home), citing *Florida* v. *Jardines*, supra, 569 U.S. 12–14 (Kagan, J., concurring); cf. *State* v. *Jacques*, supra, 332 Conn. 278 (''The capacity to claim the protection of the fourth amendment does not depend [on] a property interest, permanency of residence, or payment of rent but [on] whether the person who claims fourth amendment protection has a reasonable expectation of privacy in the invaded area. . . . [A] person is entitled to fourth amendment protection anywhere he resides where he has a reasonable expectation of privacy.'' (Citations omitted; internal quotation marks omitted)). We also underscored this state's strong preference for warrants under article first, § 7. See, e.g., *State* v. *Kono*, supra, 113. Although there are a few limited, narrowly tailored exceptions to this preference, which, as a rule, ''arise out of

---

[26] ''Both the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution prohibit the issuance of a search warrant in the absence of probable cause.'' *State* v. *Sawyer*, 335 Conn. 29, 37, 225 A.3d 668 (2020).

State *v.* Correa

acknowledged interests in protecting the safety of the police and the public and in preserving evidence,'' we explained that ''the use of a canine sniff for drugs in response to an anonymous tip will rarely, if ever, rise to the level of urgency required by these precedents.'' (Internal quotation marks omitted.) Id. In light of the foregoing, it is not surprising that, in *Kono*, we stated our holding as follows: ''[W]e conclude that a canine sniff directed toward a home—whether freestanding or part of a multitenant structure—is a search under article first, § 7, and, as such, requires a warrant issued upon a court's finding of probable cause.'' Id., 122. For all these reasons, cases from other jurisdictions holding that a canine sniff of the door to an apartment is lawful if supported by a reasonable and articulable suspicion are incompatible with our reasoning and holding in *Kono*. We conclude, therefore, that a canine sniff of the door to an apartment is a search requiring a warrant supported by probable cause.

Of course, it does not necessarily follow from this determination that a canine sniff of the door to a motel room is also a search for which a warrant based on probable cause is required. We repeatedly emphasized in *Kono* that our decision in that case rested in no small measure on the fact that an apartment is a home; see id., 112 (''[b]oth this court and the United States Supreme Court have drawn a bright line around the home''); id. (''respect for the sanctity of the home is at the very core of the fourth amendment'' (internal quotation marks omitted)); and we acknowledge that, most often, guests staying at a motel do not live there. Although, as in *Kono*, we recognize that one's privacy interests are greatest in his or her home; id. 120–21; our determination in the present case that a canine sniff of the exterior door to a motel room is a search for purposes of article first, § 7, is predicated on the similarities in the nature of the privacy interests implicated

State *v.* Correa

by a canine sniff of the outside of a motel room and a canine sniff of the outside of an apartment or condominium. We believe that these similarities also militate in favor of the conclusion that, under article first, § 7, a canine sniff of the exterior door to a motel room is subject to the same warrant requirement as a canine sniff of the door to a residence. Furthermore, as we previously noted, the few recognized exemptions from the warrant requirement invariably involve searches conducted under circumstances requiring immediate action by the police, generally, in the interest of police or public safety; see, e.g., *State* v. *Miller*, supra, 227 Conn. 383; a consideration that is not implicated by a canine sniff performed to ascertain whether a motel room contains unlawful drugs.

Finally, our conclusion finds significant support in the fact that "Connecticut has long had a strong policy in favor of warrants under article first, § 7, a policy that has been held to [provide] broader protection than the fourth amendment in certain contexts." (Internal quotation marks omitted.) *State* v. *Kono*, supra, 324 Conn. 113. "Indeed, [u]nder the state constitution, *all* warrantless searches, [regardless of] whether . . . the police have probable cause to believe that a crime was committed, are per se unreasonable, unless they fall within one of a few specifically established and well delineated exceptions to the warrant requirement." (Emphasis added; internal quotation marks omitted.) Id. In other words, a search or seizure conducted without a warrant issued upon probable cause is presumed to be unreasonable; *State* v. *Waz*, supra, 240 Conn. 374 n.16; and the state's heavy burden of overcoming that presumption is met only in certain exceptional or compelling circumstances. See id., 374–75 n.16 (identifying limited exceptions to warrant requirement). Due to the substantial privacy interests an individual has in his or her motel room, because canine sniffs for drugs

State *v.* Correa

generally are not conducted to address urgent concerns related to police and public safety, and ''[i]n light of our demonstrated constitutional preference for warrants and our concomitant obligation narrowly to circumscribe exceptions to the state constitutional warrant requirement''; *State* v. *Miller*, supra, 227 Conn. 386; we are not persuaded that an exemption from the warrant requirement should be extended to a canine sniff of the exterior door to a motel room, as the state advocates. We believe, rather, that, in the present context, the ''balance between law enforcement interests and [an individual's] privacy interests . . . tips in favor'' of the latter, given that ''our state constitutional preference for warrants [occupies the] dominant place in that balance . . . .'' Id., 385. Accordingly, we reject the state's claim that a canine sniff of the exterior door to a motel room is lawful if supported by a reasonable and articulable suspicion and conclude, instead, that such a search satisfies state constitutional requirements only if it follows the issuance of a warrant founded on probable cause.

IV

THE CANINE SNIFF AND THE INDEPENDENT
SOURCE DOCTRINE

We next address the state's contention that, even if the canine sniff of the exterior door to the defendant's motel room violated the state constitution, the evidence seized from the room was admissible under the independent source doctrine. Before considering the applicability of the doctrine to the facts of the present case, however, we set forth the principles underlying it. ''It is well recognized that the exclusionary rule has no application [when] the [g]overnment learned of the evidence from an independent source. . . . Independent source, in the exclusionary rule context, means that the tainted evidence was obtained, in fact, by a search

State *v.* Correa

untainted by illegal police activity. . . . The doctrine
is based on the premise that the interest of society in
deterring unlawful police conduct and the public inter-
est in having juries receive all probative evidence of a
crime are properly balanced by putting the police in
the same, not a *worse*, position that they would have
been in if no police error or misconduct had occurred.''
(Citations omitted; emphasis in original; internal quota-
tion marks omitted.) *State* v. *Cobb*, 251 Conn. 285, 333,
743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct.
106, 148 L. Ed. 2d 64 (2000).

"To determine whether [a] warrant was independent
of the illegal entry, one must ask whether it would have
been sought even if what actually happened had not
occurred . . . . That is to say, what counts is whether
the actual illegal search had any effect in producing the
warrant . . . .'' *Murray* v. *United States*, 487 U.S. 533,
542 n.3, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988); see
also *State* v. *Cobb*, supra, 251 Conn. 335 (explaining
that "the decision to seek the warrant [for the search
of the defendant's car] was not prompted by the infor-
mation gleaned from the [prior] illegal conduct'' because
evidence established "that the decision to seek the war-
rant would have been the same irrespective of the pre-
warrant discovery of the small amount of tainted
information''). In other words, a prior illegal entry by
the police does "not require suppression of evidence
subsequently discovered at those premises when exe-
cuting a search warrant obtained on the basis of infor-
mation wholly unconnected with the [unlawful] entry.''
*Murray* v. *United States*, supra, 535. Consequently, a
source of information is not "genuinely independent''
of the unlawful intrusion if the information gleaned
from that intrusion is necessary to establish probable
cause. Id., 542. Thus, to prevail under the independent
source doctrine, the state must establish *both* that the
warrant was supported by probable cause derived from

State *v.* Correa

sources entirely separate and distinct from the prior illegal entry *and* that the police would have applied for the warrant, even if they had not acquired the tainted information.[27] See id., 541–42 and n.3; *State* v. *Vivo*, 241 Conn. 665, 672–73, 677–78, 697 A.2d 1130 (1997). When those two requirements are met, the otherwise suppressible evidence will be admissible because the prior unlawful entry "did not contribute in any way to [the] discovery of the evidence seized under the warrant"; *Segura* v. *United States*, 468 U.S. 796, 815, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984); thereby ensuring that the discovery was the product of a source truly independent of any illegality. See id.

With these principles in mind, we turn to the state's contention under the independent source exception to the warrant requirement. As a threshold matter, the state maintains that, because the defendant did not contest the propriety of the canine sniff in the trial court, the state never had the opportunity to demonstrate that the police would have sought the warrant irrespective of the canine sniff and that, as a consequence, the record is inadequate for our review of the defendant's unpreserved constitutional claim. According to the state, we should decline to consider the defendant's claim because of the unfairness that would result due to the state's inability to present evidence supporting its contention that any constitutional impropriety in its reliance on the canine sniff was obviated by the

---

[27] We note that, with respect to the second requirement of the independent source doctrine, which requires a fact based inquiry; see, e.g., *Murray* v. *United States*, supra, 487 U.S. 543; the United States Supreme Court has observed: "To say that a [trial] court must be satisfied that a warrant would have been sought without the illegal entry is not to give dispositive effect to [the] police officers' assurances on the point. [When] the facts render those assurances implausible, the independent source doctrine will not apply." Id., 540 n.2.

State *v.* Correa

independent source doctrine.[28] The state further contends that, if we conclude to the contrary that the record is adequate for review, the lawfully obtained information set forth in the search warrant affidavit—that is, information that the police obtained wholly unrelated to the canine sniff—constituted probable cause to search the defendant's motel room. With respect to the requirement that the police would have sought a search warrant irrespective of the canine sniff, the state contends that the record, even if deemed adequate for review, is nevertheless ambiguous as to that requirement, an ambiguity that, the state further asserts, "favors the state because the defendant will not have borne his burden of producing evidence establishing that the seized evidence was tainted by the illegality."

In response, the defendant argues that the record is adequate for review because, although the state concededly had no occasion to adduce facts at the suppression hearing relating specifically to its independent source claim relative to the canine sniff, the state did present testimony to support its independent source claim relative to the visual sweep, which, according to the defendant, is the same testimony that the state would have adduced for purposes of demonstrating a source independent of the canine sniff. The defendant also contends that, in light of that testimony, the state cannot

---

[28] Typically, of course, a defendant who raises a constitutional claim for the first time on appeal is required to demonstrate the adequacy of the trial record for purposes of establishing his or her claim under *Golding*. See footnote 10 of this opinion. In the present case, however, there is no dispute that the record is adequate for review of the *defendant's* claim concerning the invalidity of the canine sniff. See footnote 12 of this opinion. The issue, rather, is whether the record is adequate for review of the *state's* claim that the evidence seized as a result of that canine sniff is admissible under the independent source doctrine. As we explain more fully hereinafter, if the record is inadequate for review of the state's independent source claim, it would be unfair to address the defendant's claim on that record because to do so would effectively foreclose the state from establishing its claim of an independent source.

State *v.* Correa

meet its burden of establishing an independent source, first, because the evidence discovered by the police that was untainted by the canine sniff did not rise to the level of probable cause to search the room and, second, because the testimony did not establish that the police would have sought the warrant even if the canine sniff had never occurred. We conclude that the information available to the police unrelated to the canine sniff was sufficient to establish probable cause for the search, but we further conclude, for the reasons that follow, that a remand is necessary to afford the state the opportunity to demonstrate that the police would have sought the warrant regardless of the canine sniff.[29]

We turn first to the issue of whether, as the defendant claims, the record is adequate for review of the state's independent source claim with respect to the canine sniff. The state does not appear to dispute, and we agree, that the record is adequate for review of the first part of the two part test, that is, whether the warrant affidavit contained information establishing probable cause derived from sources entirely unconnected to the canine sniff. Accordingly, with respect to that component of the test, we must determine whether the facts untainted by the canine sniff were sufficient, standing alone, to support the issuance of the warrant. We agree with the state that they were.[30]

---

[29] In light of our determination that the current record is inadequate for our resolution of the state's independent source claim, the state cannot prevail on its alternative contention that the record, if deemed adequate, is ambiguous as to whether the police would have sought a warrant irrespective of the canine sniff, an ambiguity that, the state further contends, defeats the defendant's contention that the seized evidence was tainted by the canine sniff.

[30] Whether facts are "enough to support a finding of probable cause is a question of law . . . subject to plenary review on appeal." (Internal quotation marks omitted.) *State* v. *Holley*, 324 Conn. 344, 351, 152 A.3d 532 (2016). The test for determining probable cause in the context of a search is well settled. "Probable cause to search exists if . . . (1) there is probable cause to believe that the particular items sought to be seized are connected with

JANUARY, 2022 340 Conn. 619

State *v.* Correa

The following facts bear on the issue of whether the
police had probable cause to search the motel room
independent of the canine sniff. Sergeant Broems
observed the Yukon in which Taveras was a passenger
pull up to the motel around 1:20 a.m., at which time
Taveras exited the vehicle, entered room 118 for about
one minute, exited the room, and reentered the Yukon,
which then drove off. The area was known for drug
activity, and, on the basis of his training and experience,
Sergeant Broems believed that Taveras' conduct likely
involved a drug transaction. After promptly stopping the
vehicle, the police detected a strong smell of marijuana,
and, upon searching Taveras, they discovered five glass
jars, two of which contained marijuana, and a knotted
corner of a plastic sandwich bag containing heroin. The
operator of the vehicle, Brickman, told the police that
Taveras was staying at the motel but that he did "[not]

---

criminal activity or will assist in a particular apprehension or conviction
. . . and (2) there is probable cause to believe that the items sought to be
seized will be found in the place to be searched. . . . Although [p]roof of
probable cause requires less than proof by a preponderance of the evidence
. . . [f]indings of probable cause do not lend themselves to any uniform
formula because probable cause is a fluid concept—turning on the assess-
ment of probabilities in particular factual contexts—not readily, or even
usefully, reduced to a neat set of legal rules. . . . Consequently, [i]n
determining the existence of probable cause to search, the issuing magistrate
assesses all of the information set forth in the warrant affidavit and should
make a practical, nontechnical decision whether . . . there is a fair proba-
bility that contraband or evidence of a crime will be found in a particular
place. . . . Probable cause, broadly defined, [comprises] such facts as
would reasonably persuade an impartial and reasonable mind not merely
to suspect or conjecture, but to believe that criminal activity has occurred."
(Citations omitted; internal quotation marks omitted.) *State* v. *Shields*, 308
Conn. 678, 689–90, 69 A.3d 293 (2013), cert. denied, 571 U.S. 1176, 134 S.
Ct. 1040, 188 L. Ed. 2d 123 (2014). Thus, probable cause is determined by
applying a "totality of the circumstances" test. (Internal quotation marks
omitted.) *State* v. *Holley*, supra, 352; see also *Florida* v. *Harris*, 568 U.S.
237, 244, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013) ("In evaluating whether
the [s]tate has met [the probable cause] standard, [the court has] consistently
looked to the totality of the circumstances . . . [and has] rejected rigid
rules, bright-line tests, and mechanistic inquiries in favor of a more flexible,
all-things-considered approach." (Citations omitted.)).

State *v.* Correa

know what [Taveras] was getting'' when he entered and then quickly exited the motel room. After Taveras told the police that he was living with his grandmother, the police went to her home and, with his grandmother's consent, searched Taveras' room, where they found numerous plastic bags with the corners cut off, consistent with narcotics packaging, along with other bags containing an off-white powder residue. According to his brother, Taveras was in the process of moving out of that house.

When the police returned to the motel, they learned that it had been rented by an individual named "Victor Taveras," who the police believed was probably Eudy Taveras, and the defendant. Shortly thereafter, Sergeant O'Brien observed the defendant walking toward him on Home Court. Upon seeing Sergeant O'Brien, the defendant immediately changed direction and began walking east on East Main Street. Sergeant O'Brien approached the defendant, who was found to have a large amount of cash and a key to room 118 on his person. Sergeant O'Brien then informed the defendant that the police had arrested Taveras and that "the jig is up," to which the defendant responded, "nothing in the room is mine," implying that there was something in the room with which the defendant did not want to be associated.[31]

---

[31] We note that our summary of the evidence pertaining to the probable cause issue includes certain facts developed by the police after the canine sniff was performed, in particular, the information garnered by the police as a result of their encounter with the defendant. As the state asserts, however, it is perfectly clear that the encounter and the information that the police obtained therefrom had nothing to do with the canine sniff; it is apparent, rather, that Sergeant O'Brien was prompted to stop and question the defendant because the police knew that the defendant had rented the motel room that was the focus of their investigation. There is nothing in the record to suggest either that Sergeant O'Brien would not have confronted the defendant when he saw him on the street or that his interaction with the defendant would have been different in any way if the canine sniff had not occurred.

State *v.* Correa

These facts established probable cause to search the room for evidence of narcotics offenses. The information developed by the police that was unrelated to the canine sniff demonstrated that Taveras was staying in the room, that he was involved with drugs, and that he likely also was selling drugs. Moreover, the room was linked to drugs by virtue of Sergeant Broems' belief, based on his training and experience, that Taveras was engaged in a drug transaction when he entered and immediately exited the room in the middle of the night. Finally, the probability that there were drugs or drug related items in the room was enhanced by the defendant's self-serving statement to the police, who discovered a large quantity of cash and a key to the room in his possession, denying that anything in the room belonged to him. On the basis of these facts, we agree with the Appellate Court that the evidence was sufficient to "persuade a reasonable person to believe that criminal activity had occurred [and that it] would also lead a reasonable person to conclude that there was a fair probability that contraband or evidence of that crime would be found in room 118.''[32] *State* v. *Correa,* supra, 185 Conn. App. 336.

With respect to the requirement that the police would have sought a search warrant based on this information irrespective of the canine sniff, the following additional facts and procedural history are relevant. As we discussed previously, the defendant filed a motion to suppress the evidence seized from his motel room on the ground that Sergeant Broems' visual sweep of the room,

---

[32] The Appellate Court did not reach the state's claim concerning the applicability of the independent source doctrine to the canine sniff or the visual sweep. *State* v. *Correa,* supra, 185 Conn. App. 331 n.20, 340 n. 23. In concluding that the police had probable cause to search the motel room prior to the visual sweep, the Appellate Court relied on the same facts that provide the basis for our determination that probable cause existed for purposes of the state's claim of an independent source relative to the canine sniff. See id., 336.

State *v.* Correa

which occurred after the canine sniff, required a search warrant supported by probable cause. In response to the defendant's motion to suppress, the state argued that the visual sweep was permitted under the exigent circumstances exception to the warrant requirement to prevent the destruction of evidence but that, even if the sweep could not be justified on that basis, the seized evidence was admissible under the independent source doctrine. To establish the applicability of that doctrine—which was dependent on proof that the decision to seek a search warrant was made before the officers conducted the visual sweep of the defendant's motel room, thereby demonstrating that the fruits of the sweep played no role in the warrant application decision—the state adduced the suppression hearing testimony of Sergeants Broems and O'Brien regarding the timing of the decision to seek a warrant.

In that testimony, Sergeants Broems and O'Brien explained that the decision to apply for a warrant was made before the visual sweep of the defendant's motel room occurred, and the trial court's memorandum of decision reflects its finding confirming that sequence of events. In the course of their testimony, however, Sergeants Broems and O'Brien also explained that the decision to seek the search warrant was made after Cooper, the canine officer, alerted to the presence of drugs inside the defendant's motel room. More particularly, following testimony by Sergeant O'Brien concerning his decision to conduct the canine sniff of exterior door to the room and the manner in which he conducted it, the prosecutor asked him: "Now, while you're running Cooper up and down the hallway past the [m]otel rooms . . . what else is . . . going on?" Sergeant O'Brien responded that Sergeant Broems was speaking by phone to the shift commander, Lieutenant Mazzucco, and to Sergeant Novia, who were at police headquarters, and that Officer Sheperis remained in his patrol car

State *v.* Correa

with Taveras, who was being detained. The prosecutor then inquired of Sergeant O'Brien: "So now, armed with all of this information that you currently have, do you, Sergeant Broems, and Officer Sheperis make a decision at this point in time?" Sergeant O'Brien responded: "Yeah, at that point, it was determined that . . . we were going to head back to headquarters and start typing the search warrant application for that [m]otel room."

Subsequently, on redirect examination, the prosecutor posed the following question to Sergeant O'Brien: "There was a line of questioning during [cross-examination], which seemed to suggest that, possibly, you and your fellow investigating officers only decided to . . . get a search warrant . . . after [the visual sweep of] the room. But it's your testimony that that's not, in fact, the case, correct? "Sergeant O'Brien responded: "Correct." The prosecutor then asked him: "And when did you determine . . . to get a search warrant for the room, initially?" Sergeant O'Brien answered: "When Sergeant Broems and Officer Sheperis began to transport Taveras into headquarters initially, and that was after . . . the canine search."[33]

The prosecutor elicited similar testimony from Sergeant Broems. Specifically, she asked Sergeant Broems whether he could "enumerate" for the court "what information [he] . . . believed [rose] to the level of probable cause for a search warrant" for the defendant's motel room at the time he headed to police headquarters to seek the warrant. Sergeant Broems responded that

_____

[33] As we previously noted, the police detained Taveras after they discovered marijuana and suspected that he had heroin in his possession following the traffic stop of the vehicle, operated by Brickman, in which Taveras was a passenger. The police did not transport Taveras to headquarters for processing, however, until more than one hour later and after they had received his grandmother's consent to search his bedroom, where they found additional incriminating evidence.

State *v.* Correa

the decision to seek a search warrant was based on all of the evidence that had been obtained that evening, which included the canine sniff of the room. After summarizing the evidence gathered prior to the canine sniff, Sergeant Broems completed his answer to the prosecutor's question as follows: "[A]t that point, [Sergeant O'Brien] does a narcotics sniff of the four rooms which . . . was new to me; I've never done something like that, which . . . was more building upon probable cause.

"And then we're speaking with people [namely, the shift supervisor, Lieutenant Mazzucco, and Sergeant Novia], making sure we have enough [evidence], because I'd have to wake up Your Honor or a judge at that time [to obtain a warrant for the defendant's room]. So, that's really what my concerns were, or was [the] decision making at that time.

"So, I believed I had enough to get a search warrant after discussing it with the shift lieutenant. And we were basing all of that probable cause on the fact of getting a search warrant for that room."

For purposes of the suppression hearing, it is apparent that the state was on notice of the significance of the sequence of the events leading up to the officers' decision to obtain the warrant. The state, however, was *not* on notice of the import of what the officers *would have done* if the canine sniff had not occurred. It is *that* issue—whether the officers would have sought a warrant even if Sergeant O'Brien had not conducted the canine sniff—that is critical to the determination of whether the independent source doctrine renders the seized evidence admissible despite the canine sniff. See, e.g., *United States* v. *Johnson*, 994 F.2d 980, 987 (2d Cir.) (to determine applicability of independent source doctrine, court "must consider whether the agents would have applied for a warrant had they not [engaged

State *v.* Correa

in the unlawful search] beforehand''), cert. denied, 510
U.S. 959, 114 S. Ct. 418, 126 L. Ed. 2d 364 (1993).
Because, however, the defendant did not raise the issue
of the constitutionality of the canine sniff in the trial
court, the state had no reason to adduce evidence dem-
onstrating that the police were, in fact, prepared to seek
a search warrant prior to the sniff or that they otherwise
would have done so if the sniff had not occurred. Under
such circumstances, in which the defendant's belated
constitutional challenge to the canine sniff effectively
foreclosed the state from seeking to prove that the
unlawful intrusion did not contribute to the seizure of
the evidence pursuant to the search warrant, it would
be unfair to the state to resolve the defendant's constitu-
tional claim on the basis of the current, undeveloped
record.

In light of the foregoing, we also agree with the state
that, contrary to the claim of the defendant, the record
is not clear as to whether the police would have sought
a search warrant if the canine sniff had not occurred.
Certain testimony of Sergeants O'Brien and Broems,
however, suggests that the state may be able to establish
that the police would have applied for the warrant irre-
spective of the canine sniff. For example, Sergeant
O'Brien testified in response to the prosecutor's ques-
tion regarding what evidence he believed constituted
probable cause for a warrant: ''From the very beginning,
just the totality of the whole thing; the fact that Sergeant
Broems had said he saw Taveras go into . . . that
[m]otel room, to that specific [m]otel room. He made
the motor vehicle stop, they located the marijuana on
Taveras, as well as that bag of heroin or suspected
heroin. You know, the fact that we then searched his
room and saw the additional baggie corners. And then
going back and, I mean, just everything—and leading
up to, you know, to seeing the registration card with
. . . Taveras on it. I mean, *up until that point, even*

State *v.* Correa

*. . . prior to seeing [the defendant's] name, and we*
*were getting ready to, obviously, go that route as far as*
*the search warrant is concerned. And then the canine,*
*obviously, the canine alert helped confirm things . . .*
*with that specific room.*'' (Emphasis added.)

The testimony of Sergeant Broems similarly provides
some support for the state's reliance on the independent
source doctrine. For example, when testifying about
the information on which he had relied in deciding to
seek the warrant, he characterized the results of the
canine sniff as ''more building [on] probable cause,''
suggesting that the canine sniff might not have been
integral to the decision to apply for the warrant.

The testimony of Sergeants O'Brien and Broems indi-
cates that, even before the canine sniff, the police inves-
tigation was focused on room 118 and that the goal of
that investigation was to obtain a search warrant for
that room. Their testimony, however, is not definitive
with respect to whether the police would have sought
a search warrant for the room, even if the canine sniff
had not revealed the likelihood that there were illegal
narcotics inside. Acknowledging as much, the state con-
tends that the inadequacy of the record with respect
to its independent source claim dictates that we reject
the defendant's constitutional challenge to the canine
sniff under *Golding*'s first prong because it would be
manifestly unfair to the state to deprive it of the oppor-
tunity to supplement the record with respect to that
claim, an option that, the state further asserts, would be
inappropriate under that prong of *Golding*. In support
of this contention, the state relies primarily on *State* v.
*Brunetti*, 279 Conn. 39, 901 A.2d 1 (2006), cert. denied,
549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007).

In *Brunetti*, the father of the defendant, Nicholas A.
Brunetti, had signed a consent to search form permit-
ting the police to search his family home, where Bru-

State *v.* Correa

netti, a suspect in a recent murder, resided with his parents. See id., 48. Following his arrest on that charge, Brunetti filed a motion to suppress certain evidence seized by the police as a result of the consent search, claiming that his father's consent was not knowing and voluntary and, therefore, was constitutionally infirm. Id. Through counsel, Brunetti had informed the court that, although his mother had declined to sign the consent to search form, he was not claiming that her refusal to do so rendered the search unlawful. Id. The trial court denied Brunetti's motion to suppress on the ground that his father's consent was knowing and voluntary. Id., 50. Following his conviction, Brunetti appealed, claiming, inter alia, that the consent to search violated his rights under the federal and state constitutions because the state had failed to establish that *both* of his parents had consented to the search of their home. Id., 46–47. We concluded that the record was inadequate for review of Brunetti's unpreserved claim because the state was not on notice that it was required to establish the consent to search of his mother as well as his father, and, as a result, the record was inconclusive in regard to the alleged consent of his mother.[34] Id., 58–59 and n.31. We further explained that, in light of the inadequacy of the record, we would not remand the case to the trial court for further proceedings because "that is what the first prong of *Golding* was designed to avoid." Id., 55 n.27; see also id. (explaining that "[a] contrary rule [permitting such remands] would promote ceaseless litigation by discouraging parties from raising claims in a timely manner, thereby seriously undermin-

_____

[34] As we explained in *Brunetti*, "[i]t is beyond dispute that the act of declining to *sign* a consent to search form is not tantamount to a refusal to *consent* to the search; rather, it is simply one of several relevant factors that a court considers in determining the validity of a consent to search." (Emphasis in original.) *State* v. *Brunetti*, supra, 279 Conn. 56. Thus, the refusal of Brunetti's mother to sign the consent form was not dispositive of the issue of whether she had consented to the search. See id., 56–62.

State *v.* Correa

ing the efficient administration of justice''); *State* v. *Golding*, supra, 213 Conn. 240 (''The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim.'').

Thus, *Brunetti* provides support for the state's position that, because the record is inadequate for resolution of the state's independent source claim due to the fact that the defendant failed to challenge the propriety of the canine sniff in the trial court, the defendant is not entitled to review of his constitutional claim on appeal. Although we agree that the first prong of *Golding* ordinarily would bar appellate review of the defendant's unpreserved constitutional claim because remands to supplement the record are generally not permitted, we are persuaded, for the reasons that follow, that such a remand is appropriate under the unusual circumstances of the present case. In the present case—and in contrast to the manner in which we resolved the unpreserved constitutional claim in *Brunetti*—the Appellate Court opted to consider and decide the merits of the defendant's claim concerning the constitutionality of the canine sniff without first addressing the adequacy of the record in regard to the state's independent source claim. In doing so, the Appellate Court acted within its discretion because an ''appellate tribunal is free . . . to respond to the defendant's [unpreserved constitutional] claim by focusing on whichever [of the four *Golding* requirements it deems] most relevant in the particular circumstances.'' *State* v. *Golding*, supra, 213 Conn. 240. For the reasons set forth in parts II and III of this opinion, however, we disagree with the Appellate Court's resolution of the merits of the defen-

State *v.* Correa

dant's claim that the canine sniff violated article first, § 7. Consequently, if we were to reject the defendant's claim due to an inadequate record and not reach the merits of that claim, the decision of the Appellate Court with respect to that claim ordinarily would stand, thereby remaining the law of this state. That outcome, however, would be contrary to the unanimous determination of this court that the canine sniff was unlawful. Alternatively, we could vacate the Appellate Court judgment. Vacatur, however, is an extraordinary remedy; see, e.g., *Fay* v. *Merrill*, 338 Conn. 1, 29 n.24, 256 A.3d 622 (2021); most "commonly utilized . . . to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences." (Internal quotation marks omitted.) *Private Healthcare Systems, Inc.* v. *Torres*, 278 Conn. 291, 303, 898 A.2d 768 (2006). More important, the exercise of our authority to vacate the Appellate Court judgment would result in confusion with respect to the legality of a warrantless canine sniff of a motel room, an important constitutional issue squarely presented by this appeal in light of the Appellate Court's decision to address and resolve that issue. We do not find either of these options satisfactory.

Furthermore, as we have discussed, in *Brunetti*, we did not reach the unpreserved constitutional claim concerning the propriety of the consent search of Brunetti's home because the record was inadequate for appellate review of that claim. See *State* v. *Brunetti*, supra, 279 Conn. 58–59 and n.31. This was so because "the facts relevant to the issue of [Brunetti's] mother's consent never were adduced in the trial court." Id., 64. Due to the incomplete record concerning that critical issue, we further explained that "the facts revealed by the record [were] inadequate to establish *whether the alleged constitutional violation did, in fact, occur*." (Emphasis added.) Id. In the present case, by contrast, although the current record is not adequate for our

State *v.* Correa

determination of the state's independent source claim, the facts revealed by the record *are* adequate for the resolution of the issue of the constitutionality of the canine sniff, which the Appellate Court did undertake. For this reason, as well, the present case is distinguishable from *Brunetti*.

We conclude, therefore, that it is appropriate to remand the case to the trial court so that the state may present additional evidence in connection with its independent source claim. It bears emphasis, however, that, in reaching this conclusion, we do not signal a retreat from the general rule, long adhered to by this court, that a defendant's failure to provide an adequate record is fatal to an unpreserved constitutional claim raised for the first time on appeal. Rather, we will deviate from that rule only when exceptional circumstances mandate it, a standard that has been satisfied in the present case.[35]

V

THE CANINE SNIFF AND THE INEVITABLE
DISCOVERY DOCTRINE

The state also contends that the evidence seized from the motel room was admissible under the inevitable

_____

[35] This court previously has ordered a remand for further proceedings in similar circumstances, albeit in a case decided prior to *Golding*. In *State* v. *Badgett*, 200 Conn. 412, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986), the defendant, Earl Badgett, entered a conditional plea of nolo contendere to the illegal possession of heroin with intent to sell. Id., 413. Badgett then appealed, claiming, inter alia, that the trial court had improperly denied his motion to suppress evidence seized in connection with the warrantless search of the automobile he was driving at the time of his arrest. Id., 414. We agreed with Badgett that the warrantless entry into his vehicle by the police violated his rights under the fourth amendment. Id., 421. Instead of ordering the suppression of the evidence seized as a result of that search, however, we remanded the case to the trial court to give the state the opportunity to present evidence in support of a claim under the inevitable discovery doctrine, a claim that the state had not made in the trial court or on appeal. See id., 432–34. In doing so, we explained that, in light of the nature and importance of the issues involved, our remand for further proceedings was in the public interest and,

State *v.* Correa

discovery doctrine because, prior to the canine sniff, the police were actively investigating Taveras, they had probable cause to obtain a search warrant for the room and planned to do so, and they would have sought and obtained a warrant even if Sergeant O'Brien had not conducted the canine sniff. The state further contends that Taveras' statement confirming the presence of drugs inside the motel room—which he gave to the police at headquarters prior to their seeking a search warrant—was untainted by the illegal search and provides additional evidence to support the claim that the police inevitably would have secured a warrant irrespective of the canine sniff. Although acknowledging that, "whether the [inevitable discovery] doctrine applies ordinarily is, at least in the first instance, a question of fact for the trial court"; *State* v. *Cobb*, supra, 251 Conn. 339; see also *United States* v. *Durand*, 767 Fed. Appx. 83, 88 n.5 (2d Cir. 2019) (applicability of inevitable discovery doctrine requires fact intensive inquiry to be conducted by trial court); the state maintains that, in the present case, we can decide this fact specific issue for the first time on appeal—that is, as a matter of law—because "the undisputed historical facts established by the record reveal that [the only] rational conclusion [that can] be drawn" is that the evidence seized from the motel room inevitably would have been discovered by lawful means in the absence of the canine sniff. We disagree with the state that we may decide the issue as a matter of law, but we also conclude that the state must be given the opportunity, on remand, to present additional evidence in support of its inevitable discovery claim.

"Under the inevitable discovery rule, evidence illegally secured in violation of the defendant's constitutional rights need not be suppressed if the state

under the circumstances, necessary to do justice between the parties. See id., 432 n.10. We reach the same conclusion in the present case.

State *v.* Correa

demonstrates by a preponderance of the evidence that
the evidence would have been ultimately discovered by
lawful means. . . . To qualify for admissibility the state
must demonstrate that the lawful means [that] made
discovery inevitable were possessed by the police and
were being actively pursued *prior* to the occurrence of
the constitutional violation.'' (Citation omitted; empha-
sis in original.) *State* v. *Badgett*, 200 Conn. 412, 433,
512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423,
93 L. Ed. 2d 373 (1986). Accordingly, ''[c]ourts resolve
claims of [inevitable discovery] under a [two step] pro-
cess. First, the court must evaluate the progress of the
investigation at the time of the government misconduct
to determine whether an active and ongoing investiga-
tion was in progress at [that time]. At this step, the
government must establish that the investigation was
not triggered or catalyzed by the information unlawfully
gained by the illegal search but, rather, that the alternate
means of obtaining the challenged evidence was, at
least to some degree, imminent, if yet unrealized at the
time of the unlawful search. Second, the court must,
*for each particular piece of evidence*, specifically ana-
lyze and explain how, if at all, discovery of that piece
of evidence would have been more likely than not inevi-
table absent the unlawful search.''[36] (Emphasis in origi-

---

[36] As we previously have observed, the independent source and inevitable
discovery doctrines are ''closely related''; (internal quotation marks omitted)
*State* v. *Vivo*, supra, 241 Conn. 672; because ''[b]oth . . . rest on assump-
tions that if the law enforcement agencies involved had eschewed the illegal
activity, they nevertheless would have procured the evidence at issue'';
(internal quotation marks omitted) id., 673 n.5; thus obviating the illegality
and rendering suppression of the evidence unnecessary. See id., 672–73. They
''have distinct applications in relation to the exclusionary rule,'' however;
id., 672; inasmuch as ''the independent source rule applies only upon proof
that *in actual fact* the officers did not obtain the challenged evidence as a
result of the primary illegality''; (emphasis in original; internal quotation
marks omitted) id., 673 n.5; whereas the inevitable discovery exception,
which has been characterized as an ''extrapolation from the independent
source doctrine''; *Murray* v. *United States*, supra, 487 U.S. 539; ''assumes
that the evidence was in fact obtained as a consequence of the primary
illegality but is invoked by proof that—hypothetically—if the officers had
not engaged in the primary illegality, they would nevertheless, although

State *v.* Correa

nal; internal quotation marks omitted.) *In re 650 Fifth Avenue & Related Properties*, 934 F.3d 147, 165 (2d Cir. 2019); see also *United States* v. *Cabassa*, 62 F.3d 470, 473 and n.2 (2d Cir. 1995) (explaining that government's burden of establishing that challenged evidence inevitably would have been discovered required detailed showing of each of contingencies involved, including analysis of strength of government's showing of probable cause, "the extent to which the warrant process [had] been completed at the time those seeking the warrant learn of the search," whether agents obtained warrant after illegal search, and whether there was "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause").

In *State* v. *Brown*, 331 Conn. 258, 286–87, 202 A.3d 1003 (2019), we adopted the approach utilized by the Second Circuit Court of Appeals with respect to the

---

in a different manner, have obtained the challenged evidence." (Internal quotation marks omitted.) *State* v. *Vivo*, supra, 673 n.5.

When, as in the present case, the police seize evidence pursuant to a search warrant but the application for that warrant was predicated in part on a prior, illegal entry, the independent source exception generally is the doctrine invoked for the purpose of establishing that suppression of the evidence is not required notwithstanding the unlawfulness of the prewarrant intrusion. See, e.g., *United States* v. *Johnson*, supra, 994 F.2d 987 (observing that courts apply independent source doctrine in cases in which police discover evidence "while engaging in an unlawful search or entry, but where there was an independent basis apart from the illegal entry to allow a warrant to issue"); see also *United States* v. *Mulholland*, 628 Fed. Appx. 40, 43 n.3 (2d Cir. 2015) (observing that, in government's view, independent source doctrine rather than inevitable discovery doctrine applied because challenged evidence actually was seized pursuant to search warrant obtained following unlawful entry). Nevertheless, in the present case, the state relies on the inevitable discovery doctrine as well as the independent source doctrine. In light of our determination affording the state the opportunity to adduce additional evidence in connection with its claims under both doctrines, and because the distinction between the two doctrines is not always a "sharp" one; *United States* v. *Baez*, 983 F.3d 1029, 1037 (8th Cir. 2020), cert. denied,      U.S.     , 141 S. Ct. 2744, 210 L. Ed. 2d 896 (2021); see also *United States* v. *Johnson*, 380 F.3d 1013, 1014 (7th Cir. 2004); for present purposes, we need not express a view as to the applicability of the inevitable discovery doctrine separate and apart from the independent source doctrine.

State *v.* Correa

nature of the proof necessary for the state to prevail on a claim that the otherwise inadmissible fruits of an illegal search inevitably would have been discovered notwithstanding that unlawful search, thereby eliminating the need for suppression of that evidence. As we explained in *Brown*, "proof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment . . . . The focus on demonstrated historical facts keeps speculation to a minimum, by requiring the [court] to determine, viewing affairs as they existed at the instant before the unlawful search occurred, what would have happened had the unlawful search never occurred. . . . Evidence should not be admitted, therefore, unless a court can find, with a *high level of confidence*, that *each* of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor."[37] (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 287, quoting *United States* v. *Stokes*, supra, 733 F.3d 444.

[37] With respect to the requirement that the state must prove by a preponderance of the evidence that the tainted evidence inevitably would have been discovered irrespective of the unlawful search, the Second Circuit has "acknowledged that using the [preponderance of the evidence] standard to prove inevitability creates a problem of probabilities, [observing] that even if each event in a series is individually more likely than not to happen, it still may be less than probable that the final event will occur." *United States* v. *Vilar*, 729 F.3d 62, 84 (2d Cir. 2013), cert. denied, 572 U.S. 1146, 134 S. Ct. 2684, 189 L. Ed. 2d 230 (2014). Recognizing the need to avoid any confusion that might result from this "semantic puzzle"; *United States* v. *Cabassa*, supra, 62 F.3d 474; the Second Circuit Court of Appeals has aptly underscored the significance of the "difference between proving by a preponderance that something *would have happened* and proving by a preponderance that something *would inevitably have happened*"; (emphasis in original; internal quotation marks omitted) *United States* v. *Heath*, 455 F.3d 52, 59 n.6 (2d Cir. 2006); and further explained that "the government must prove that each event leading to the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the [trial court] to conclude, by a preponderance of the evidence, that the evidence would inevitably have been discovered." *United States* v. *Vilar*, supra, 84.

State *v.* Correa

It is apparent that the investigating officers on the scene were seeking to develop enough evidence to obtain a search warrant for the motel room, even before the canine sniff was conducted, and, to that end, they were engaged in ongoing conversations concerning that evidence with supervisory personnel, stationed at head-quarters, during the course of the investigation. Conse-quently, it cannot reasonably be disputed that, both prior to and after the canine sniff, the police were involved in investigative activities, pertaining both to Taveras and to the defendant, for the purpose of obtaining a search warrant. As the state maintains, therefore, the evidence reveals that the police were actively involved in an investigation that, at least potentially, could have resulted in their obtaining a warrant, even if the canine sniff had never occurred.

The state further posits, however, that the record also establishes, first, that the police had sufficient probable cause to obtain a warrant immediately prior to the canine sniff and, second, that they would have sought and obtained a warrant irrespective of the canine sniff. The state contends that, because it has demonstrated these two contingencies, the evidence seized from the motel room was admissible against the defendant because it inevitably would have been discovered in the absence of the canine sniff. On the basis of the record before us, we are not persuaded, contrary to the state's claim, that the evidence adduced at the suppres-sion hearing proves as a matter of law that the police would have sought a search warrant irrespective of the canine sniff.

With respect to the question of whether the police had probable cause to search the motel room prior to the canine sniff,[38] we agree with the state that the informa-

_____

[38] The facts relevant to this issue are set forth in detail in parts I and IV of this opinion.

State *v.* Correa

tion known to the police at that time constituted proba-
ble cause to believe that Taveras, who was staying in
the room, was involved in the drug trade and that he
was using the room to facilitate that trade. Although
sufficient to support the issuance of a search warrant,
this evidence cannot be characterized as constituting a
particularly strong showing of probable cause. Because
"[r]easonable minds may disagree as to whether a par-
ticular [set of facts] establishes probable cause"; (inter-
nal quotation marks omitted) *State* v. *Sawyer*, 335 Conn.
29, 38, 225 A.3d 668 (2020); and because the state "can-
not prevail under the inevitable discovery doctrine
merely by establishing that it is more probable than not
that the disputed evidence would have been obtained
without the constitutional violation . . . proving that
a judge *could* validly have issued a warrant supported
by probable cause [is] not necessarily enough to estab-
lish that a judge *would* have issued the warrant in ques-
tion." (Citations omitted; emphasis in original; footnote
omitted.) *United States* v. *Heath*, 455 F.3d 52, 58–59
(2d Cir. 2006). In other words, "probable cause on its
own is not enough; inevitable discovery requires that
the [trial] court have a high level of confidence that the
warrant would have—not could have—been issued
. . . and the government bears the burden of proof
. . . ." (Citations omitted; internal quotation marks
omitted.) *United States* v. *Christy*, 739 F.3d 534, 543
n.5 (10th Cir.), cert. denied, 574 U.S. 844, 135 S. Ct.
104, 190 L. Ed. 2d 84 (2014); see also *United States* v.
*Cabassa*, supra, 62 F.3d 473–74 (in circumstances in
which "there is some room for disagreement" as to
whether facts known to police prior to illegal search
would have been sufficient for issuance of warrant,
there is "a residual possibility that a . . . judge would
have required a stronger showing of probable cause,"
thereby defeating state's inevitable discovery claim).
For present purposes, however, we need not decide

State *v.* Correa

whether the state has met its burden in this regard in light of our determination, discussed more fully in this opinion, that, on remand, the state must be afforded the opportunity to present additional evidence in support of its claim under the inevitable discovery doctrine. Instead, we leave it to the trial court to decide, in the first instance, whether the state has established that the facts known to the police prior to the canine sniff give rise to a sufficiently high likelihood that a judge would have issued a search warrant on the basis of those facts.[39]

With respect to the question of whether the police would have sought a warrant even if the canine sniff had not occurred, the testimony indicated that the decision to apply for a warrant was a collective one—made by the police who were at the scene in consultation with and with the approval of the supervisory officials who remained at headquarters—and that that joint decision was arrived at after the canine sniff. The state nonetheless contends that certain excerpts from the testimony of Sergeants O'Brien and Broems demonstrate that they believed they had probable cause to search the room before the canine sniff was conducted *and* that they would have sought a warrant based on that evidence if the canine sniff had not occurred. More specifically, the state relies on Sergeant O'Brien's testimony that they were "getting ready" to "go [the search warrant] route" prior to the canine sniff and that the "alert helped confirm things . . . with that specific

_____

[39] It is true, of course, that the police did eventually seek and obtain a search warrant for the motel room. It bears noting, however, that the affidavit submitted to the issuing judge in support of the warrant application contained far more evidence of drugs in the motel room than the police possessed prior to the canine sniff. Indeed, that affidavit contained truly overwhelming evidence of probable cause, including the results of the canine sniff, the observation by the police of drug related paraphernalia during their visual sweep of the room, and the statement by Taveras after he had been transported to police headquarters that he kept marijuana in the room.

State *v.* Correa

room,'' and on Sergeant Broems' testimony characterizing the canine sniff as ''more building upon probable cause.'' This testimony and other testimony confirm that, prior to the sniff, Sergeants O'Brien and Broems believed that they were closing in on their goal of developing the evidence necessary to obtain a search warrant, but it does not clearly or necessarily establish that the police would have sought a warrant even in the absence of the canine sniff.[40] Because this court lacks the authority to find facts; see, e.g., *Ashmore* v. *Hartford Hospital*, 331 Conn. 777, 785, 208 A.3d 256 (2019); we cannot resolve the factual issue presented by the state's inevitable discovery claim unless the undisputed evidence leads to only one possible conclusion. See *State* v. *Cobb*, supra, 251 Conn. 339. Although arguably supporting such a finding, the testimony certainly does not dictate it. Without evidence that would render this factual issue free from all doubt, we cannot purport to resolve it.

The state further maintains that the police also would have sought and obtained a search warrant for the motel room on the basis of the statement that Taveras gave to the police, after he had been taken to headquarters, acknowledging that he kept marijuana in the room. As we stated in *Brown*, ''in order to bear its burden [of] prov[ing] that the inevitable discovery exception to the exclusionary rule applie[s] [to the statement of a witness], the state [is] required to prove by a preponderance of the evidence . . . that . . . [the witness] *would have cooperated and provided the same infor-*

_____

[40] Indeed, certain testimony adduced by the state indicates that the police would not have sought a warrant unless they were able to make what they believed was a strong showing of probable cause. In particular, as we noted previously; see part IV of this opinion; Sergeant Broems explained that, because the investigation was being conducted in the middle of the night, he wanted to make sure that the police had ample evidence of probable cause, sufficient to justify waking a judge to review the warrant application and affidavit.

State *v.* Correa

*mation*,'' even if the illegal search had not occurred. (Emphasis added.) *State* v. *Brown*, supra, 331 Conn. 285–86.

This is no easy task, especially when, as in the present case, the statement at issue was obtained by the police from a suspect during the course of an active, fast moving investigation. Indeed, as the Third Circuit Court of Appeals has observed, cases in which the doctrine has been applied to admit statements, as distinguished from physical evidence, are few and far between. See *United States* v. *Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998). ''While we know of no articulation of the inevitable discovery doctrine that restricts its application to physical evidence . . . it is patent why cases have generally, if not always, been so limited. A tangible object is hard evidence, and absent its removal will remain where left until discovered. In contrast, a statement not yet made is, by its very nature, evanescent and ephemeral. Should the conditions under which it was made change, even but a little, there could be no assurance the statement would be the same.'' Id., 195–96; see also, e.g., *United States* v. *Rodriguez*, Docket No. 3:06-cr-57 (JCH), 2006 WL 2860633, *11 (D. Conn. October 4, 2006) (holding that ''the government . . . failed to satisfy its burden of proving that [the defendant inevitably] would have made the same statements,'' especially because ''the statement at issue [was] made by a non-law enforcement person, for it is harder to determine what such an individual might have said or done during a police investigation''), rev'd on other grounds sub nom. *United States* v. *Delossantos*, 536 F.3d 155 (2d Cir.), cert. denied sub nom. *Rodriguez* v. *United States*, 555 U.S. 1056, 129 S. Ct. 649, 172 L. Ed. 2d 628 (2008).

On the basis of the current record, we cannot conclude with the required high level of confidence that Taveras would have provided the same incriminating

State *v.* Correa

statement to the police if the canine sniff had not
occurred. As we previously discussed, after the police
stopped the Yukon in which Taveras was a passenger,
they found drugs in Taveras' possession and arrested
him. He was then placed in Officer Sheperis' cruiser,
where he remained until he was transported to police
headquarters more than one hour later. Upon his arrest,
Taveras denied that he had been in the motel or had
any connection to it, and he also denied having any
additional marijuana. Because Taveras was detained in
Officer Sheperis' cruiser, which was parked at the motel
when the canine sniff was performed, there is a likeli-
hood that Taveras witnessed Sergeant O'Brien conduct
the canine sniff—the walkway in front of room 118 was
open, illuminated and readily visible from at least fifty
yards away—and that he therefore was aware that Coo-
per had alerted on the room. Only thereafter, following
his transportation to headquarters, did Taveras
acknowledge that he kept marijuana in the room. In
light of these events, there is also a real possibility that
Taveras, who previously had refused to make any such
admissions to the police, decided to confess to having
marijuana in the motel room in the interest of limiting
his criminal exposure, for, by then, Taveras had every
reason to believe that the police, armed with the results
of the canine sniff, would obtain a search warrant for
the room and, upon executing it, find a large cache
of heroin therein. Moreover, even if Taveras had not
witnessed the canine sniff, it would have been consis-
tent with common police practice for the officers ques-
tioning Taveras to inform him of the canine sniff in
order to induce him to confess to his drug involvement,
and to otherwise cooperate with the police, before they
obtained a search warrant for the room.

Under these circumstances, the state bears the bur-
den of establishing that the canine sniff was not used
by the police, directly or indirectly, to procure Taveras'

State *v.* Correa

statement and, further, that Taveras' willingness to provide the particular statement that he did—with its incriminating reference to the marijuana he kept in the motel room—was not influenced by any knowledge of the canine sniff. See, e.g., *Murray* v. *United States*, supra, 487 U.S. 542 n.3 (inevitable discovery is rule inapplicable if illegal search had "any effect" in producing warrant); *State* v. *Brown*, supra, 331 Conn. 288 ("The requirement that the state prove that each contingency would have been resolved in its favor demands that, at the least, the state [must] prove . . . that it would have . . . secured the same level of cooperation from [the witness] in the absence of the illegally obtained [evidence]. . . . [The witness'] cooperation was a contingency [on] which the procurement of a statement incriminating himself and the defendant depended. The state [bears] the burden, therefore, to prove that this contingency would have resolved in its favor."); see also 6 W. LaFave, Search and Seizure (5th Ed. 2012) § 11.4 (c), pp. 399–400 ("[when] the defendant was present when incriminating evidence was found in an illegal search or was confronted by the police with incriminating evidence they had illegally seized earlier, it is apparent that there has been an exploitation of that illegality when the police subsequently question the defendant about that evidence or the crime to which it relates" (footnotes omitted; internal quotation marks omitted)). This is particularly true in view of the fact that Taveras had refused to provide the police with any such information prior to the canine sniff. Although the testimony adduced at the suppression hearing does not foreclose the possibility that Taveras would have given the same incriminating statement, even in the absence of the canine sniff, on the strength of the record before us, we are unable to conclude without resort to speculation that he would have done so.

The fact that the current record does not support the conclusion that the evidence seized pursuant to the

State *v.* Correa

warrant inevitably would have been discovered irrespective of the canine sniff, however, does not mean that the state cannot prove its claim. As with the state's contention under the independent source doctrine, the state had no reason to adduce proof of the elements of its inevitable discovery claim because the defendant did not challenge the propriety of the canine sniff in the trial court. Accordingly, on remand, the state must be given the opportunity to present additional evidence in support of that claim, as well.

## VI

## THE VISUAL SWEEP

The defendant next claims that the Appellate Court incorrectly concluded that the trial court correctly had determined that the visual sweep of the defendant's motel room was justified by exigent circumstances, in particular, the need to forestall the destruction of evidence. We agree with the defendant that, under the circumstances, the possibility that evidence would be destroyed was too speculative to justify the visual sweep.[41]

The following legal principles guide our review of the defendant's claim with respect to the exigent circumstances doctrine, an exception to the warrant requirement that is triggered when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable . . . ." (Internal quotation marks omitted.) *Kentucky* v. *King*, 563 U.S. 452, 460, 131 S. Ct 1849, 179 L. Ed. 2d 865 (2011). "The exception enables law enforcement officers to handle emergenc[ies]—situations presenting a compelling need for official action

---

[41] As we previously noted, the state also argues that, even if the visual sweep was not supported by exigent circumstances, the trial court correctly concluded that any such illegality is obviated by the independent source doctrine. We discuss this contention in part VII of this opinion.

State *v.* Correa

and no time to secure a warrant.'' (Internal quotation
marks omitted.) *Lange* v. *California*,      U.S.      , 141
S. Ct. 2011, 2017, 210 L. Ed. 2d 486 (2021). ''The term,
exigent circumstances, does not lend itself to a precise
definition but generally refers to those situations in
which law enforcement agents will be unable or unlikely
to effectuate an arrest, search or seizure, for which
probable cause exists, unless they act swiftly and, with-
out seeking prior judicial authorization.'' (Internal quo-
tation marks omitted.) *State* v. *Gant*, 231 Conn. 43,
63–64, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038,
115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). Thus, ''[t]he
core question is whether the facts, as they appeared at
the moment of entry, would lead a reasonable, experi-
enced officer to believe there was an urgent need to
render aid or take action.'' (Internal quotation marks
omitted.) *United States* v. *Moreno*, 701 F.3d 64, 73 (2d
Cir. 2012), cert. denied, 569 U.S. 1032, 133 S. Ct. 2797,
186 L. Ed. 2d 864 (2013). As this court has observed;
see, e.g., *State* v. *Aviles*, 277 Conn. 281, 294, 891 A.2d
935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L.
Ed. 2d 69 (2006); courts have recognized three general
categories as justifying the application of the exigent
circumstances doctrine, namely, danger to human life,
the flight of a suspect, and, most relevant here, ''the
imminent destruction of evidence  .  .  .  .'' *Brigham
City* v. *Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164
L. Ed. 2d 650 (2006). In each such category, ''the delay
required to obtain a warrant would bring about some
real immediate and serious consequences—and so the
absence of a warrant is excused.'' (Internal quotation
marks omitted.) *Lange* v. *California*, supra, 141 S.
Ct. 2017.

The test for determining whether a warrantless entry
was justified to prevent the imminent destruction of
evidence is well established and seeks to ascertain
whether, under the totality of the circumstances, the

State *v.* Correa

police had both probable cause to search and reasonable grounds to believe that evidence would be destroyed if immediate action were not taken. See, e.g., *State* v. *Guertin*, 190 Conn. 440, 447, 454, 461 A.2d 963 (1983). "This is an objective test; its preeminent criterion is what a *reasonable*, [well trained] police officer would believe, not what the . . . officer actually did believe." (Emphasis in original; internal quotation marks omitted.) Id., 453. "Rather than evaluating the significance of any single factor in isolation, courts must consider all of the relevant circumstances in evaluating the reasonableness of the officer's belief that immediate action was necessary''; *State* v. *Kendrick*, 314 Conn. 212, 229, 100 A.3d 821 (2014); and ''[t]he reasonableness of a police officer's determination that [such] an emergency exists is evaluated on the basis of facts known at the time of entry.'' (Internal quotation marks omitted.) *State* v. *Aviles*, supra, 277 Conn. 293–94. Consequently, the applicability of the exigent circumstances doctrine must be determined on a ''case-by-case basis''; *Birchfield* v. *North Dakota*, U.S. , 136 S. Ct. 2160, 2174, 195 L. Ed. 2d 560 (2016); see also *Riley* v. *California*, 573 U.S. 373, 402, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014) (exigent circumstances exception ''requires a court to examine whether an emergency justified a warrantless search in each particular case''); an ''approach [that] reflects the nature of emergencies. Whether a 'now or never situation' actually exists—whether an officer has 'no time to secure a warrant'—depends [on] facts on the ground.'' *Lange* v. *California*, supra, 141 S. Ct. 2018. Furthermore, because warrantless searches are disfavored, ''the police bear a heavy burden when attempting to demonstrate an urgent need that might justify [a search without a warrant].'' *Welsh* v. *Wisconsin*, 466 U.S. 740, 749–50, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984). Finally, because determining whether the circumstances of any particular case were sufficiently

State *v.* Correa

exigent to justify a warrantless search is a question of law, we review de novo the conclusions of the trial court and the Appellate Court regarding the doctrine's applicability to the facts of the present case. *State* v. *Kendrick*, supra, 222.

As we previously discussed, following the canine sniff, the officers decided that Sergeant Broems and Officer Sheperis would return to police headquarters to prepare an application for a search warrant while Sergeant O'Brien remained at the motel to continue the surveillance of room 118. Minutes after Sergeant Broems and Officer Sheperis departed, Sergeant O'Brien observed the defendant walking nearby and radioed Sergeant Broems to return to the motel, which he did. At that time, the defendant was searched, and a large quantity of cash and a key to room 118 were found in his pocket. The defendant was initially cooperative and agreed to let the officers into the room, but, when they got to the door, he changed his mind and refused to do so. Sergeant Broems then took the room key from the defendant, opened the door and looked inside the room for approximately fifteen to thirty seconds, at which time he observed a large black digital scale on a table and a plastic sandwich bag lying near it on the floor. The visual sweep and the resulting police observation of the scale and sandwich bag, both of which constituted evidence of drug trafficking, were referenced in the affidavit in support of the search warrant application.

Following his arrest, the defendant moved to suppress the evidence seized from the room on the ground that Sergeant Broems' visual sweep was a search requiring a warrant supported by probable cause. The state did not dispute that the visual sweep was a search for constitutional purposes but maintained that the sweep was justified under the exigent circumstances exception to the warrant requirement to prevent someone

State *v.* Correa

who might be inside the room from destroying evidence.
To establish the applicability of the doctrine, the prose-
cutor questioned Sergeants Broems and O'Brien about
their reasons for believing that the sweep was necessary
to prevent the destruction of evidence pending the
application for and issuance of a search warrant.

Specifically, the prosecutor asked Sergeant O'Brien
if he or Sergeant Broems had inquired of the defendant,
after the defendant refused to open the door to the
motel room, whether anyone was inside the room. Ser-
geant O'Brien responded that he did not recall asking
that question but "it definitely would have been a con-
cern of ours . . . ." When asked to "elaborate" on that
and "why would that be a concern," Sergeant O'Brien
responded: "Well, I mean, at this point, I mean, if any-
body was, and we were already thinking we had—
before we had even—just to back track—before I ran
. . . Cooper on the breezeway, on that first floor [hall-
way], we knocked on the door, and we didn't get a
response. So, it was at that point, after not getting a
response, that . . . I decided to use . . . Cooper to
. . . do the sweep of the doors.

"So, plus, you know, between the male that we had
stopped initially in the SUV and then [Taveras'] brother,
I mean, at any point, any one of these people could
have, you know, called. And, if there was somebody in
there and said, hey, look, you know, the cops are all
over this place, it's typical. . . . I mean, people drive
by all the time and say they see their friends . . . being
stopped or spoken to . . . . And calls are made . . . ."

On cross-examination, Sergeant O'Brien was asked
whether there was "[a]nything specific" that caused him
to think that someone might be in the room. Sergeant
O'Brien responded that, although there were "[n]o
audio indications whatsoever," "[w]e had no reason not
to believe [it]. Just because somebody doesn't answer

State *v.* Correa

the door when there's a narcotics investigation going, doesn't mean that there isn't potentially somebody [in] there." On redirect examination, the prosecutor asked Sergeant O'Brien whether it was "possible that a concern of yours could have been that . . . Taveras' brother could have tipped off [the defendant] or one of his associates to destroy evidence inside the room?" Sergeant O'Brien responded: "Yeah, I believe I indicated that earlier as far as, you know, on the motor vehicle stop that, you know, often, people drive by and see their friends, you know, being stopped or detained, and phone calls are . . . quickly made . . . ." Sergeant O'Brien further testified that "[t]he light off could have meant that as well, in my opinion. I mean, there was nothing to indicate that there was nobody else . . . in that room . . . . You're asking me for indicators that . . . somebody was in there? I had none . . . ."

Defense counsel engaged Sergeant Broems in a similar line of questioning. Specifically, he asked him whether he could offer "any fact, any articulation, as to why you believed there was someone in . . . room 118?" Sergeant Broems stated: "I can't give you fact[s] because there was nobody in there. But I can tell you, through my twenty years of experience, why there's a possibility. I made a motor vehicle stop, there was two people in a car, I had Taveras . . . with me; [but] the driver was able to leave. I then went over to Charles Street; there was his brother there at that location; we then left that location.

"We then went to the [m]otel clerk . . . . So I don't know who made any calls, I don't know anything. So, based on my training and experience, I—that's what I based it on, that there was more than one person that knew about that room and . . . had access to that room."

In its memorandum of decision denying the defendant's motion to suppress, the trial court rejected the

State *v.* Correa

defendant's claim that the visual sweep was not justified by the exigent circumstances exception to the warrant requirement. The court concluded that the sweep was permissible because, as both Sergeants O'Brien and Broems testified, it was possible that someone had alerted "potential confederates" of the defendant about the "Stamford police's investigation into the activity in room 118," thus "prompting" these unknown associates to destroy evidence located in the room. The trial court also relied on Sergeant O'Brien's testimony that, "when it comes to prostitution or narcotics trafficking out of hotel rooms . . . it is quite common for additional people to be present" in the room, "regardless of the actual number of registered parties."

The Appellate Court agreed with the trial court that the visual sweep was permissible to prevent the destruction of evidence. *State* v. *Correa*, supra, 185 Conn. App. 340. The Appellate Court reasoned that the police had interacted "with at least four people who were not taken into police custody" on the night in question, in particular, Brickman, Taveras' brother and grandmother, and the motel manager, and that "phone calls may have occurred" between these people "and possible confederates [of the defendant], prompting the destruction of evidence inside of the room." Id., 337. The Appellate Court further explained that "it was reasonable for the police to fear that even unknown passersby might become aware of the police investigation into room 118" and alert someone who, in turn, could have destroyed evidence inside the room. Id., 337. Finally, the Appellate Court stated: "Sergeant Broems . . . noted that, from the time Taveras entered the room [earlier in the evening] until the . . . police returned to the room with the defendant after 3 a.m., there was 'nobody with eyes on' the room, which might have allowed an unknown person to enter [the room] and [to] destroy evidence contained therein. Although no

State *v.* Correa

one answered when the police knocked on the door
. . . and there was no evidence confirming the pres-
ence of an additional person in [the room], these facts,
coupled with the observation of a light on in the room,
provided ample reason to believe that, [in the absence
of] swift action in opening the door to room 118 and
performing a visual sweep, there was a significant risk
of the destruction of evidence.'' Id., 339–40.

On appeal, the defendant challenges the Appellate
Court's determination that the trial court correctly con-
cluded that exigent circumstances justified the visual
sweep. The defendant argues, first, that the police
lacked probable cause to believe that evidence of an
offense would be found in the room when they con-
ducted the visual sweep and, second, that neither Ser-
geant O'Brien nor Sergeant Broems was able to identify
any fact or combination of facts sufficient to lead a
police officer reasonably to believe that someone was
in the room who had been alerted to the need to destroy
incriminating evidence located inside. In that regard,
the defendant asserts that the fact that the light was
on in the room was the only concrete piece of evidence
that supported the officers' belief that someone might
be in the room, evidence that, the defendant further
maintains, was patently inadequate to justify a war-
rantless entry on grounds of exigent circumstances.

With respect to the probable cause requirement, we
agree with the state that the police had probable cause
to search the room following their encounter with the
defendant. In part IV of this opinion, we explained why
the facts known to the police at that time constituted
probable cause to search the room, and we need not
repeat that discussion here.[42]

_____

[42] It bears emphasis, however, that our probable cause determination does
not include the canine sniff or, for that matter, any information gathered
by the police following the canine sniff that reasonably might have been
obtained as a result of the canine sniff.

State *v.* Correa

As for the exigency requirement, we agree with the defendant that, contrary to the determination of the trial court and the Appellate Court, the belief held by the police that an immediate visual sweep of the room was necessary to avert the destruction of evidence was not objectively reasonable. Of course, the police knew that neither one of the two individuals actually linked to the motel room, Taveras and the defendant, was in a position to destroy evidence located inside the room because Taveras was under arrest and the defendant was with the police when the visual sweep was conducted. Moreover, there is nothing in the record to suggest that the police had reason to believe that anyone else had a similarly direct connection to the room or its contents. Consequently, the only concern that the police reasonably could have had with respect to the destruction of evidence located inside the room was based solely on the possibility—unsupported by any facts—that there was someone in the room who could be notified of the police investigation and destroy any such evidence. The state has not identified a single case, however, and our independent research has not revealed one, in which a warrantless entry was found to be justified on similar facts, that is, facts establishing merely that someone who had become aware of a police investigation involving the suspect might possibly alert that suspect of the investigation and, in turn, the suspect might possibly enlist some unknown confederate—one with immediate access to incriminating evidence—to destroy that evidence.

In fact, in *State* v. *Spencer*, 268 Conn. 575, 580, 596–97, 848 A.2d 1183, cert. denied, 543 U.S. 957, 125 S. Ct. 409, 160 L. Ed. 2d 320 (2004), we rejected a nearly identical claim in the context of a warrantless protective sweep of the apartment of the defendant, Michael Spencer, following Spencer's arrest outside of the apartment, and our reasons for doing so are fully applicable in

State *v.* Correa

the present case. As we explained in *Spencer*: ''[T]he officers' testimony reveals that [the police] had no information that any person who posed a threat to the officers or to others might have been in the apartment at [the] time [of the search].'' Id., 595–96. ''The generalized possibility that an unknown, armed person may be lurking [inside] is not . . . an articulable fact sufficient to justify a protective sweep. Indeed, nearly every arrest involving a large quantity of drugs, in or just outside of a home, carries the same possibility. To allow the police to justify a warrantless search based solely [on] that possibility would threaten to swallow the general rule requiring search warrants. Furthermore, allowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay ignorant as to whether anyone else is inside a house in order to conduct a protective sweep. . . . The officers' lack of information cannot be an articulable basis for a sweep that requires information to justify it in the first place.'' (Citation omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) Id., 596–97; see also, e.g., *United States* v. *Burleigh*, 414 Fed. Appx. 77, 78 (9th Cir. 2011) (''the police [officers'] speculations that there were individuals inside the warehouse who might destroy evidence and that these individuals knew or might be alerted that the warehouse was under surveillance [was] insufficient to meet the government's burden of proving exigent circumstances''); *United States* v. *Menchaca-Castruita*, 587 F.3d 283, 295–96 (5th Cir. 2009) (''There will always be some possibility that an unknown person might be hiding somewhere inside a residence, waiting for an opportunity to . . . destroy evidence. A finding of exigent circumstances, however, must be based on more than a mere possibility; it must be based on an officer's reasonable belief that the delay necessary to obtain a warrant will facilitate the destruc-

State *v.* Correa

tion or removal of evidence . . . . [T]he totality of the circumstances [fell] well short of any reasonable foundation for such speculation.'' (Emphasis omitted.)); *United States* v. *Carter*, 360 F.3d 1235, 1241 (10th Cir. 2004) (''There was simply no evidence that destruction of evidence was likely. Indeed, the government point[ed] to no reason to believe that other people were in the garage, or even the house.''); *United States* v. *Driver*, 776 F.2d 807, 810 (9th Cir. 1985) (government's ''burden is not satisfied by leading a court to speculate about what may or might have been the circumstances'' requiring warrantless entry); *United States* v. *Agapito*, supra, 620 F.2d 336 n.18 (''[The court does] not suggest that law enforcement officers who arrest an individual outside the premises never may conduct a security check inside the premises. . . . [I]n such a case, the arresting officers must have (1) a reasonable belief that third persons are inside, and (2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public.'' (Citations omitted.)).

Thus, at a minimum, the state was required to point to specific and articulable facts that, taken together with rational inferences from those facts, gave rise to a reasonable belief that someone was, in fact, inside the defendant's motel room when the police conducted the visual sweep. Cf. *United States* v. *Almonte-Báez*, 857 F.3d 27, 33 (1st Cir. 2017) (exigency due to imminent destruction of evidence existed when ''agents knocked on the front door of the apartment and identified themselves,'' ''heard someone inside the apartment running away from the door,'' and ''noticed that the door was sealed shut''); *United States* v. *Andino*, 768 F.3d 94, 99 (2d Cir. 2014) (officers reasonably believed that destruction of evidence was likely when woman, upon learning of their investigation, slammed apartment door shut,

State *v.* Correa

began opening and closing drawers, and turned on faucet); *United States* v. *Ramirez*, 676 F.3d 755, 758, 763, 765 (8th Cir. 2012) (government had "fail[ed] to establish that it was reasonable for the officers to conclude that [the] destruction of evidence was imminent, thereby establishing exigent circumstances warranting the forced entry" into defendant's hotel room, when "the only sound [the officer] heard from the room . . . after he ultimately knocked on the door" was "the sound of an individual approaching the door," and officers subsequently heard no sounds of "dead bolt lock being engaged, no toilet flushing or a shower or faucet running, and no shuffling noises or verbal threats emanating from the room"); *United States* v. *Etchin*, 614 F.3d 726, 733–34 (7th Cir. 2010) ("[A]n emergency justifying entry and a search arises only if the officer knocking at the door observes objective evidence that there is an ongoing crime within that must be stopped before it is completed. The sound of someone walking around, for example, or a voice that announces, '[t]he cops are here,' is not enough by itself. But other sights and sounds—toilets flushing, a door slammed, people running, an obvious lie by the person answering the door, or efforts to remove contraband from the house—may be evidence that there is an emergency that calls for an immediate, warrantless intrusion."), cert. denied sub nom. *Cole* v. *United States*, 562 U.S. 1156, 131 S. Ct. 953, 178 L. Ed. 2d 786 (2011); *United States* v. *Leveringston*, 397 F.3d 1112, 1116 (8th Cir.) ("The occupant of the suite reacted to [the] police knocking by looking through curtains, expressing surprise, and then immediately shutting the curtains. This response was followed by sounds of pots and pans slamming, dishes breaking, water flowing, and a garbage disposal running. The officers reasonably could infer that these sounds indicated the destruction of evidence of drug trafficking in response to the presence of the police."), cert. denied,

State *v.* Correa

546 U.S. 862, 126 S. Ct. 159, 163 L. Ed. 2d 145 (2005); *United States v. Bonner*, 874 F.2d 822, 825 (D.C. Cir. 1989) (exigency exists when, inter alia, "officers heard sounds consistent with . . . destruction of the object of the search"); *United States* v. *Alfonso*, 759 F.2d 728, 742–43 (9th Cir. 1985) (when hotel room door was opened in response to knock on door by police, who observed suspect and several others in room and heard " 'hurried scuffling noise' coming from the bathroom," police reasonably believed that "concealed presences might pose danger, or that an unidentified person might be able to destroy evidence").

Except for the wholly unremarkable fact that a light was on inside the motel room, the record is devoid of any evidence from which a police officer reasonably could have concluded that someone was inside the room. Lights are routinely left on in empty homes and hotel rooms, especially at night. If this were enough to create the kind of emergency justifying warrantless entry, the exigent circumstances exception would immediately cease to be an exception and, instead, would become the rule. In other words, if the warrantless search by the police in the present case is deemed to be supported by exigent circumstances, then such a search will be permissible whenever there is any possibility that the defendant or someone else might attempt to contact a third party for the purpose of having that third party destroy evidence. Indeed, that is the thrust of the state's argument: the police should be permitted to conduct a warrantless search in such circumstances. A warrantless entry, however, cannot be deemed necessary on emergency grounds on the basis of such generalized speculation, even if, on occasion, evidence may be destroyed because the police simply did not have enough information available to them to form a reasonable belief, based on the particular facts of the case at hand, that a warrantless search was justified to prevent the destruction of such evidence.

State *v.* Correa

In reaching a contrary conclusion, the Appellate Court relied primarily on *State* v. *Reagan*, 18 Conn. App. 32, 556 A.2d 183, cert. denied, 211 Conn. 805, 559 A.2d 1139 (1989), which it cited for the proposition that the search of the defendant's motel room was justified, so long as "there was a distinct possibility that someone who observed either the police stop of the Yukon, Taveras' arrest, or the police and canine presence at the motel, might inform someone involved with the criminal activity." *State* v. *Correa*, supra, 185 Conn. App. 339. We disagree that *Reagan* stands for that proposition.

In that case, the police were conducting a surveillance of the home of the defendant, Edward L. Reagan, a suspected drug dealer. *State* v. *Reagan*, supra, 18 Conn. App. 34. After witnessing what they believed to be a drug transaction between Reagan and another man, David Earl Jones, at Reagan's home, the police detained Jones a short distance from the home. Id. A number of people witnessed Jones' detention, including a woman whom the police had seen enter and exit Reagan's home earlier in the day. Id., 34–35. In concluding that immediate entry into Reagan's home was permissible to prevent the imminent destruction of evidence while the police sought a search warrant for the home, the Appellate Court, citing a number of federal cases, observed that "[i]t has been recognized that the possibility that a suspect knows or may learn that he is under surveillance or at risk of immediate apprehension may constitute exigent circumstances, on the theory that the suspect is more likely to destroy evidence, to attempt to escape or to engage in armed resistance." Id., 38. The Appellate Court further stated that "[f]ederal courts have held that exigent circumstances may exist [when the] police reasonably believe that a defendant may be alerted to the imminence of [his] arrest by the detention or arrest of a confederate and destroy incriminating evidence." Id. In all of the cited cases, however, as in *Reagan* itself,

State *v.* Correa

the police knew that the suspect was inside the place to be searched, in a position and with an obvious motive to destroy evidence of his or her crime. In the present case, by contrast, the police had no reason, beyond rank speculation, to believe that anyone was inside the defendant's motel room. Indeed, as we previously discussed, they knew for certain that the two targets of the investigation, the defendant and Taveras, were not in the room. We therefore conclude that the Appellate Court and the trial court incorrectly determined that the visual sweep of the defendant's motel room was justified by exigent circumstances.

## VII

### THE VISUAL SWEEP AND THE INDEPENDENT SOURCE DOCTRINE

Finally, the state claims that the trial court properly determined that any impropriety in the visual sweep was obviated by the independent source doctrine.[43] In support of this contention, the state asserts that, prior to the visual sweep, the facts known to the police constituted probable cause to search the room and, in addition, that the police would have sought a search warrant even if Sergeant Broems had not conducted the visual sweep.

In parts IV and VI of this opinion, we explained why the information available to the police before the canine sniff, which preceded the visual sweep, constituted probable cause.[44] Consequently, the state has satisfied

---

[43] Having set forth the principles underlying the independent source doctrine in part IV of this opinion, we do not repeat them here.

[44] We note that, in reaching the same conclusion, the trial court excised only that information contained in the warrant affidavit that was derived from the visual sweep. Because the defendant challenged the propriety of the canine sniff for the first time on appeal, the trial court had no occasion to consider whether to excise the information obtained as a result of the canine sniff.

State *v.* Correa

the first requirement of the independent source doctrine.

The next question, therefore, is whether the police would have applied for a search warrant irrespective of the visual sweep. The evidence established, and the trial court found, that the police decided to seek a warrant prior to the visual sweep. According to the testimony, however, the collective decision to apply for the warrant was made after Sergeant O'Brien conducted the canine sniff, a fact that the trial court did not consider because the propriety of the canine sniff was not an issue in the trial court.

We, of course, have concluded that the canine sniff violated article first, § 7, of the state constitution. Consequently, for purposes of the state's claim that the independent source doctrine obviates the illegality of the visual sweep, the determination as to whether the police would have sought a warrant irrespective of the visual sweep must be made in light of the fact that the canine sniff also was unlawful. That determination requires the same fact-finding that will be necessary to resolve the state's claim of an independent source relative to the canine sniff. Accordingly, on remand, the trial court also must consider the state's claim of an independent source relative to the visual sweep with due regard for the impropriety of the canine sniff, as well. Of course, the state must have the opportunity to present any additional evidence that may be relevant to that issue.

## VIII

### CONCLUSION

We conclude that the canine sniff was a search subject to the warrant requirement of article first, § 7, of the state constitution and that the failure of the police to obtain a warrant before conducting the canine sniff

violated that requirement. We also conclude that the case must be remanded to the trial court so that the state may be afforded the opportunity to adduce additional evidence concerning its claims relative to the canine sniff under the independent source and inevitable discovery doctrines, claims that, if proven, would obviate the illegality of the canine sniff and thereby eliminate the need for suppression of the evidence ultimately seized pursuant to the search warrant. We finally conclude that, although the visual sweep was not justified by exigent circumstances, the state also must be afforded the opportunity to present additional evidence to establish, in light of our determination regarding the impropriety of the canine sniff, that the constitutional infirmity of the visual sweep is obviated by the independent source doctrine.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to remand the case to the trial court for further proceedings in accordance with this opinion.

In this opinion the other justices concurred.